[No. S105569. Nov. 15, 2007.]

In re RONALD LEE BELL on Habeas Corpus.

## COUNSEL

Margaret Littlefield, under appointment by the Supreme Court, for Petitioner Ronald Lee Bell.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson and Dane R. Gillette, Chief Assistant Attorneys General, Ronald A. Bass, Gerald A. Engler and Ronald S. Matthias, Assistant Attorneys General, for Respondent State of California.

## OPINION

**BAXTER, J.**—Petitioner Ronald Lee Bell is under sentence of death for the 1978 murder of Raymond Murphy during a robbery of Wolff's Jewelry Store

in Richmond. This court affirmed petitioner's convictions and death sentence on automatic appeal (*People v. Bell* (1989) 49 Cal.3d 502 [262 Cal.Rptr. 1, 778 P.2d 129]) and denied previous petitions for writs of habeas corpus in 1990 and 1995.

The present petition was filed on April 2, 2002. On February 19, 2003, we issued an order to show cause on claim B of the petition, which asserted that petitioner is actually innocent of the robbery murder and that petitioner's brother, Larry Bell, was the actual perpetrator, and on claim C, which asserted that the prosecution introduced at trial false identification testimony from eyewitnesses Ernestine Jackson, Ruby Judge, and Dorothy Dorton. After we directed the Presiding Judge of the Contra Costa County Superior Court to select a judge to serve as a referee at an evidentiary hearing, we appointed the Honorable Thomas M. Maddock as our referee to take evidence and make findings of fact onspecified allegations.

On December 11, 2006, the referee's report was filed in this court. The referee detailed his answers to the reference questions and concluded that petitioner had failed to prove (1) that any prosecution witness had testified falsely at his trial, (2) that any prosecution witness had recanted her trial testimony identifying petitioner as the perpetrator, or (3) that petitioner was actually innocent of the murder or the related crimes. Having reviewed the record and the briefing in this court, we agree with the referee that petitioner has failed to prove the allegations in the petition. The order to show cause is discharged.

BACKGROUND

A. *The Underlying Judgment*

On February 2, 1978, petitioner entered Wolff's Jewelry Store in Richmond, shot Raymond Murphy (the store manager) and John Benjamin (an employee), and fled with more than $30,000 worth of jewelry. Murphy, who was shot in the right side of the neck, suffered fatal injuries.

Petitioner was identified as the killer by Dorothy Dorton, age 13, and by Dorton's 14-year-old aunt, Ruby Judge, who had both been in the store at the time of the robbery murder. Petitioner was also identified by Judge's adult sister and Dorton's aunt, Ernestine Jackson, who was waiting in her car outside the jewelry store. Petitioner's defense at trial, and in these proceedings, was that these three eyewitnesses had erred in their identifications and

that his brother, Larry Bell, who was some inches taller and had a substantially bigger build and a lighter skin tone, was the real culprit.

Jackson testified at trial that she had driven to Wolff's Jewelry Store around 4:00 p.m. to pick up a watch that had been repaired. She waited with Dorton and a younger niece in the car while Judge went inside to pick up the watch. As they waited, petitioner walked by and Jackson called out, "How're you doing, Ronnie Bell?" Petitioner greeted her and continued walking toward the jewelry store. Jackson told Dorton that petitioner was the man who had killed her father, Alcus Dorton, almost 10 years earlier and had been convicted of manslaughter. Dorton, who had no recollection of her father, said she wanted to get a good look at petitioner and left the car.

Dorton entered the store and found petitioner waiting while Judge was being helped. Dorton walked over to Judge and told her to ask petitioner if his name was "Larry." Judge did so; petitioner said "no." After Judge and Dorton went to the rear of the store to pay for the repair, petitioner drew a gun from his waist and shot Benjamin and Murphy. Petitioner then scooped up some jewelry, placed it in a bag, and walked out of the store. Dorton was instructed by an employee to push an alarm button.

Judge testified that she saw petitioner enter the store, followed by Dorton. She asked petitioner if his name was "Ronnie Bell"; petitioner said "no." Petitioner subsequently shot the two men at the store, scooped up some jewelry in a bag, and fled.

Jackson, who remained in the car, saw petitioner walk away about 15 minutes after their first encounter, carrying a plastic bag she had not seen earlier. He turned a corner and ran out of sight. After Dorton informed her that two men had been shot inside the jewelry store, Jackson called the police. Jackson identified petitioner in a photo lineup and at trial. Jackson had attended school with both Bell brothers and had known each for at least 10 years. She testified that she could tell the brothers apart: Larry was taller than petitioner and had a lighter complexion.

Dorton identified petitioner in a photo lineup and at trial without hesitation or difficulty and testified that she was positive the person she had seen in the jewelry store was petitioner and not his brother Larry, since she had seen Larry in the past and could distinguish between them. She identified two

photos of Larry at trial and also testified that Larry was taller and had a lighter complexion.

Judge likewise was familiar with both Bell brothers and noted their differing heights and skin tone. She too identified petitioner in a photo lineup and at trial. She was positive that petitioner had been in the jewelry store.

No physical evidence or fingerprints at the scene linked petitioner to the crimes, but groove marks on a slug obtained from Murphy's body were consistent with a slug discharged from a .38-caliber Colt "Detective Special" with a two-inch barrel. Petitioner had obtained such a gun in exchange for $50 from his father, reportedly on his brother Larry's behalf, in December 1977.

The People presented evidence that, on the day of the murder, Larry Bell had been with a woman in a motel located more than a mile from Wolff's Jewelry Store. The couple injected cocaine intravenously from early afternoon until 10:30 or 11:00 p.m., and Larry was at the motel the entire time, except for a 30- to 45-minute period when it was dark or near dark. Larry did not have a gun with him in the motel room.

The principal defense witness, Psychologist Robert Shomer, questioned the identifications by all three witnesses, opined that the child witnesses may have been confused and allowed their identifications to be influenced by others, and criticized the manner in which the police interviewed the witnesses. Dr. Shomer also found unrealistic the witnesses' claim that they bore petitioner no ill feeling over his having killed Alcus Dorton and warned that their claim might indicate strong, unconscious hostility towards petitioner.

The defense also presented evidence that Larry had used a gun similar to a .38-caliber Colt Detective Special in an assault a few days after this robbery murder and that a ring taken from the robbery was found in Larry's possession when he was arrested on unrelated charges on February 9, 1978. Larry was not called to testify or for the purpose of allowing the jury to view him, but petitioner's wife testified that Larry was only an inch and a half taller than petitioner. She admitted, however, that Larry had lighter skin and was more muscular than her husband. A defense investigator testified that it would have been possible to walk from Larry's motel room to Wolff's Jewelry Store in about 15 minutes.

Petitioner was convicted of murder with personal use of a firearm; robbery and attempted murder causing great bodily injury, also with personal use of a

firearm; and being a felon in possession of a firearm. The jury found true the special circumstance allegation that the murder was committed in the course of a robbery. The penalty was fixed at death. (*People v. Bell, supra*, 49 Cal.3d at pp. 513–519.)

B.  *The Habeas Corpus Proceeding*

The third petition for writ of habeas corpus alleged, among other things, that Ernestine Jackson saw Larry (not petitioner) outside the jewelry store but instead told the police that she saw petitioner as retaliation for petitioner having killed Alcus Dorton in 1968, that Jackson convinced her sister and her niece to corroborate her false account, and that Dorothy Dorton had since recanted her identification of petitioner. These allegations were supported by a declaration from Wanda Diane Moore, a longtime acquaintance of Jackson's, who claimed to have heard Jackson admit this misconduct during a conversation in May 1991; a declaration signed "Tanya Moore," purportedly from another longtime acquaintance of Jackson's, who claimed to have heard Jackson express her animosity toward petitioner for killing Alcus during a conversation at work sometime between 1984 and 1986; a declaration from Leroy Kelly, who knew both the Jackson family and the Bell family and who claimed to have heard Jackson, in 1993, admit to falsely accusing petitioner in order to punish him for having killed Alcus; and a declaration from Dorothy Dorton, in which she recanted her identification of petitioner and claimed Jackson had told her to lie.

On February 19, 2003, we issued an order to show cause why relief should not be granted on the grounds "that petitioner is actually innocent and that the prosecution introduced false testimony at the trial." In the return, the People, who were represented by the Attorney General and who had requested the issuance of an order to show cause, denied the relevant allegations and asked that a referee be appointed to resolve the factual conflict. We thereafter appointed a referee to hear evidence and make findings of fact on these questions:

1. In conversations with Wanda Diane Moore, "Tanya Moore," Leroy Kelly, or any other person, did eyewitness Ernestine Jackson recant her trial testimony identifying petitioner as the perpetrator of the crimes at Wolff's Jewelry Store? If so, was her trial identification of petitioner nonetheless truthful?

2. Did Ernestine Jackson instruct eyewitnesses Dorothy Dorton or Ruby Judge to lie to the police or at trial about the identity of the perpetrator? Did Jackson instruct Dorton or Judge to identify petitioner, contrary to their actual perceptions or observations? Did Jackson tell any person that, to Jackson's knowledge, the true perpetrator was petitioner's brother Larry Bell?

3. Has Dorothy Dorton ever recanted her trial testimony identifying petitioner as the perpetrator? If so, was her trial identification of petitioner nonetheless truthful?

4. Has Ruby Judge ever recanted her trial testimony identifying petitioner as the perpetrator? If so, was her trial identification of petitioner nonetheless truthful?

5. What, if any, newly discovered evidence exists that, if credited, casts fundamental doubt on the accuracy and reliability of the eyewitness testimony identifying petitioner as the perpetrator?

6. If the trial testimony of Jackson, Dorton, or Judge identifying petitioner as the perpetrator was false, was the false testimony substantially material or probative in light of all the evidence produced at the trial?

During the course of the hearing, petitioner withdrew several declarations originally offered in support of the claims for relief in his habeas corpus petition—namely, the declarations of Dorothy Dorton, "Tanya Moore," and Wanda Diane Moore—pursuant to the California Rules of Professional Conduct, rule 5-200 (rule 5-200).[1] As a result, Leroy Kelly was petitioner's sole witness at the hearing. The People called Wanda Diane Moore, *Tonia* Moore, Ernestine Jackson, Ruby Judge, Dorothy Dorton, and Michael Tye to testify. Following the reference hearing, and after reviewing the exhibits and other documentary materials submitted by the parties, the referee found that Jackson had not recanted her testimony identifying petitioner as the perpetrator of the murder, that Kelly's contrary testimony was not credible, that Jackson had not instructed Dorton or Judge to falsely identify petitioner as the perpetrator, and that Dorton and Judge had not recanted their trial testimony identifying petitioner.

---

[1] Rule 5-200 provides in pertinent part that "[i]n presenting a matter to a tribunal, a member: [¶] (A) Shall employ, for the purpose of maintaining the causes confided to the member such means only as are consistent with truth; [¶] (B) Shall not seek to mislead the judge, judicial officer, or jury by an artifice or false statement of fact or law . . . ."

The parties have filed postreference briefs on the merits. Petitionerjhas also filed exceptions to the referee's report. We address the referee's individual findings and petitioner's specific exceptions to them only insofar as they are relevant to our analysis of petitioner's claims that he is actually innocent of the robbery murder at Wolff's Jewelry Store and that his conviction was unlawfully tainted by false testimony.

DISCUSSION

■ The petition's claim of false testimony requires proof that false evidence was introduced against petitioner at his trial and that such evidence was material or probative on the issue of his guilt. (*In re Roberts* (2003) 29 Cal.4th 726, 741–742 [128 Cal.Rptr.2d 762, 60 P.3d 165].)  ■ The petition's claim of actual innocence depends on an evidentiary showing that "would 'undermine the entire prosecution case and point unerringly to innocence or reduced culpability.' " (*In re Clark* (1993) 5 Cal.4th 750, 798, fn. 33 [21 Cal.Rptr.2d 509, 855 P.2d 729].)[2] Both claims depend on petitioner's assertion that the three eyewitnesses—Ernestine Jackson, Ruby Judge, and Dorothy Dorton—falsely identified him as the perpetrator instead of identifying his brother, Larry Bell.

The central allegation of false identification was originally supported in the petition by a declaration from Wanda Diane Moore, a longtime acquaintance of Ernestine Jackson's, who said she heard Jackson admit having falsely accused petitioner because of his responsibility for Alcus Dorton's death and admit having convinced the other eyewitnesses to change their story to conform to her nefarious plot; a declaration from "Tanya Moore," purportedly another longtime acquaintance of Jackson's, who said she heard Jackson justify her trial testimony against petitioner because of petitioner's responsibility for Alcus's death; a declaration from Dorothy Dorton, in which she recanted her identification of petitioner and claimed Jackson had told her to lie to avenge Alcus's death; and a declaration from Leroy Kelly, who claimed to have heard Jackson admit falsely accusing petitioner in order to punish him for Alcus's death. By the end of the hearing, however, the record supporting petitioner's claims was much diminished. Citing the California

---

[2] Although we have not yet recognized on habeas corpus a claim of actual innocence untethered to any newly discovered evidence, we need not decide here whether such a claim would lie, inasmuch as petitioner's claim *does* rely on newly discovered evidence, the Attorney General did not challenge petitioner's ability to assert the claim of actual innocence, and the claim is meritless in any event.

Rules of Professional Conduct, petitioner declined to call Wanda Diane Moore to testify and declined as well to offer her declaration into evidence.[3] After Tonia Moore (who was called by the People) denied signing the declaration attached to the petition and denied further that she had ever discussed the murder with Jackson, petitioner declined to offer into evidence the declaration of "Tanya Moore," relying again on rule 5-200. Likewise, after Dorothy Dorton (who was called by the People) denied signing the declaration attached to the petition and denied further that Jackson had ever pressured her to identify petitioner as the perpetrator or that her trial testimony had been untruthful, petitioner withdrew Dorton's declaration for the same reason.

In other words, by the end of the hearing, petitioner's claims for relief rested almost entirely on the testimony of Leroy Kelly, who claimed that Ernestine Jackson had admitted falsely inculpating petitioner.[4] We therefore examine his testimony in some detail.

Kelly, who described himself as homeless by choice, testified that he had known petitioner, Alcus Dorton, and Ernestine Jackson for many years. He had grown up with petitioner and had gone to school with him, and their families had been close and had lived on the same block. Kelly said that, in the early 1960's, he and petitioner went regularly to Jackson's house to dance, shoot dice, and hang out. Alcus Dorton was there as well. They were all friends at that time, but Kelly was closer to Alcus than to petitioner.

What broke up the "pack," in Kelly's view, was when petitioner killed Alcus Dorton on October 15, 1968. Kelly believed that petitioner had been defending himself when he shot Alcus and that petitioner "did what every one of you all would did." Alcus, who was a "really big" man, tried to take away petitioner's girlfriend in a way Kelly did not like. Alcus then beat up petitioner and followed him home. Even when petitioner ran into his house, Alcus broke open the door. The police did not show up, and petitioner shot Alcus, fatally. Petitioner was convicted of voluntary manslaughter, in Kelly's opinion, because he had a "lousy lawyer."

Kelly said that the shooting split the community in two geographically, that everyone took either petitioner's side or Alcus's side, and that people who

---

[3] The People did call Wanda Diane Moore to testify, but she invoked her Fifth Amendment privilege against self-incrimination.

[4] Petitioner obtained the Kelly declaration in November 1999, but did not attach it or otherwise identify Kelly and describe this conversation with Jackson when he amended his federal petition in March 2000 or in June 2000, or when he asked for an evidentiary hearing in federal court in September 2001. It was only after the federal district court ruled that the claim of actual innocence had not been exhausted that petitioner presented, for the first time to any court, the Kelly declaration (along with the other declarations, since withdrawn) as an attachment to the instant petition.

sympathized with one side got "jumped" if they were caught in a neighborhood supporting the other side. Kelly moved from Richmond to Los Angeles in 1977 and was still there when he heard about petitioner being arrested for murder in 1978. Kelly said that everyone in the neighborhood and in "the whole black community" knew that petitioner was not guilty of the murder at the jewelry store.

Kelly moved back to Richmond in June 1993. The next month, he saw Ernestine Jackson outside a grocery store in El Cerrito and they exchanged greetings. Kelly claimed that Jackson then brought up "the Ronnie Bell thing." Jackson told Kelly that she had lied when she testified that petitioner had been outside the jewelry store, that in reality she had seen petitioner's brother instead, but that she decided to make sure petitioner "went down" for killing Alcus Dorton. Kelly said he had trouble believing her, called her a "liar" and a "dyke," and walked away. He told petitioner's wife about the conversation a month later and also told three friends about it but never mentioned it to the police because "[t]hat's something black people don't like to do."

Jackson, by contrast, testified that she had encountered Kelly at a grocery store in El Cerrito but had only exchanged greetings. She did not mention anything to Kelly about petitioner or his brother. Jackson further testified that she had seen petitioner, not Larry, outside the jewelry store; that she had never claimed to anyone that she actually saw Larry instead; and that she never instructed anyone to lie about the murderer's true identity.

The referee, who observed both witnesses as they testified, concluded that Jackson's testimony was credible and that Kelly's testimony was not credible. The referee found in particular that Jackson had not recanted her trial testimony during the conversation with Kelly or with any other person, that Jackson did not instruct the other eyewitnesses to lie about the murderer's true identity, and that Jackson's trial testimony identifying petitioner was truthful. We accept the referee's findings for several reasons.

First, "this court gives great weight to those of the referee's findings that are supported by substantial evidence. [Citations.] 'This is especially true for findings involving credibility determinations. The central reason for referring a habeas corpus claim for an evidentiary hearing is to obtain credibility determinations (*In re Scott* (2003) 29 Cal.4th 783, 824 [129 Cal.Rptr.2d 605, 61 P.3d 402]); consequently, we give special deference to the referee on factual questions "requiring resolution of testimonial conflicts and assessment of witnesses' credibility, because the referee has the opportunity to observe the witnesses' demeanor and manner of testifying" (*In re Malone* (1996) 12 Cal.4th 935, 946 [50 Cal.Rptr.2d 281, 911 P.2d 468]).' " (*In re Freeman*

(2006) 38 Cal.4th 630, 635 [42 Cal.Rptr.3d 850, 133 P.3d 1013].) In this instance, the referee made explicit, detailed findings concerning the basis for his credibility determinations, pointing out "that Kelly's demeanor changed, he crossed his arms and he became nervous, and was observed to actually begin sweating on his forehead" as he described his conversation with Jackson. We are not persuaded by petitioner's theory that Kelly was merely offended by the allegedly belittling tone of the People's cross-examination, inasmuch as the referee's observations of Kelly encompassed his demeanor during *direct* examination by petitioner's counsel. Nor do we find that the referee failed to give appropriate weight to the hearsay letters attesting to Kelly's character that Kelly had procured on his own behalf and that were admitted into evidence without objection.[5] That Kelly "has helped out with small jobs" is a "friendly" and "pleasant" person, and "keeps a close look" on certain businesses after hours hardly *compels* a finding that Kelly's account of his conversation with Jackson was credible, inasmuch as Kelly believed that petitioner had been unjustly convicted and punished for killing Alcus Dorton and that petitioner was likewise innocent of this robbery murder (and inasmuch as Kelly expressed hostility to Jackson, as evidenced by his use of a slur concerning her sexual orientation).

Second, Kelly's testimony suffered from various infirmities and was, at bottom, rather implausible. Kelly claimed that Alcus Dorton's death tore the community apart and that "everybody" took a side on it. Yet Kelly denied repeatedly that *he* ever did. It seems unlikely that Jackson, who allegedly took Alcus's side in this grudge that violently split the community, would suddenly choose to confide in Kelly, who had stopped hanging out at Jackson's house by the time he was sent to the Contra Costa County Boys Ranch for vehicle theft in 1965 and who thereafter never talked to her, not even to say "hi," for nearly three decades. Had Jackson offered such a confession to Kelly, she would likely have made similar statements to others—yet petitioner did not produce any such witnesses. It is also telling that petitioner did not offer corroborating testimony from any of the people with whom Kelly claimed to have discussed Jackson's startling admissions. (See *People v. Bell, supra,* 49 Cal.3d at p. 539.)

Third, Jackson lacked a sufficient motive to falsely accuse petitioner of the murder. Petitioner theorizes at length that Jackson had a "powerful" motive to seek revenge against him because he was responsible for the death of Alcus Dorton, who had fathered Dorothy Dorton with Jackson's sister, but served only a short period in custody for voluntary manslaughter. Yet the sole evidence that Jackson harbored any grudge against petitioner at the time of the murder, or that the wider community had been riven by Alcus's death,

---

[5] The People stated at oral argument that they had declined to object to these letters in order to grant petitioner the widest possible latitude to prove his claim of innocence.

consisted of Kelly's testimony. Jackson herself testified that Alcus, who never married her sister, was merely an acquaintance; that his death, while unfortunate, did not prevent her from going on with her life; that she did not have an opinion whether petitioner's sentence for Alcus's death had been long enough; and that she was unaware of any division in the community over Alcus's death. Jackson also testified, without contradiction, that she did not connect her sister's death from alcoholism in March 1973 to Alcus's death in 1968 and that her sister had in the meantime married another man. Jackson's lack of a vengeful motive was corroborated by Dorothy Dorton, who testified at her deposition that she did not even remember Alcus or whether her mother had taken his death "hard," and by Ruby Judge, who testified at her deposition that Alcus "was kind of like a bully" and "probably did something to [petitioner]" and who testified at the preliminary hearing that her mother had told her not to hold a grudge against petitioner for what happened to Alcus. Indeed, Detective Michael Tye, who interviewed Jackson at the murder scene, testified that Jackson had been reluctant to cooperate with police because of fear for her own safety and that of her sister and niece. This would hardly seem to be the behavior of a witness who was plotting to frame petitioner.

Fourth, Jackson's identification of petitioner was corroborated by the other eyewitnesses. Ruby Judge testified at trial, in a deposition, and at the reference hearing that petitioner committed the murder. So did Dorothy Dorton. The referee, who observed their testimony at the reference hearing, found that both witnesses were credible. We accept that finding not merely because the referee was able to observe their demeanor but also because Dorton was able confidently to identify petitioner, whom she had otherwise never seen before, as the murderer in a photo lineup at the police station a short time after the murder. We further note that Judge never recanted her identification of petitioner, nor was any evidence presented that she ever did.

Petitioner's various challenges to the referee's findings are unconvincing.

Petitioner complains first that Jackson was not credible because of her hostility to the habeas corpus proceedings and because of inconsistencies and hesitations in her testimony at the reference hearing. We disagree. As the district attorney pointed out at the reference hearing, Jackson had been interviewed multiple times by the police, had testified at a preliminary hearing, and had testified again at two trials. It was unfortunate but unsurprising that, as the referee found, she was irritated and did not want to testify again. Moreover, it is understandable that Jackson's recollection of conversations and events decades earlier would be hazy or incomplete. (See *In re Burton* (2006) 40 Cal.4th 205, 217 [52 Cal.Rptr.3d 86, 147 P.3d 1014].)

Petitioner claims next that Dorton was not credible, based on his alleged "showing" that Dorton lied when she denied meeting defense investigators at a Carrows Restaurant in El Cerrito and denied signing the declaration in her name recanting her trial testimony. The sole evidence that Dorton signed the declaration, which petitioner withdrew under compulsion of the California Rules of Professional Conduct, was the "impression" of a forensic document examiner that Dorton had signed and initialed the declaration while trying to distort her signature and initials. In the view of the document examiner, the initials on the first page were "probably" written by Dorton, the initials on the second page were too "scrawled and brief" to support an opinion, and the signature was too "poorly written" to support a positive identification, either, but the probability that she initialed the first page nonetheless "strongly indicated" that she had signed the third page.

The remaining evidence, however, supported Dorton's testimony that she never met with defense investigators and, thus, never signed the declaration. Neither defense investigator could identify Dorton in a photo lineup as the woman they had interviewed and who had signed the declaration. The investigators also claimed that the woman identifying herself as Dorton had attended the interview with a man identified as her cousin, Marchon King— yet petitioner, even after locating King, declined to have him testify. (See Evid. Code, § 412.) The referee's finding that Dorton did not recant is therefore supported by substantial evidence, and we accept his finding.

Finally, petitioner relies on the discrepancy between Dorton's testimony that she told Judge, in the jewelry store, to ask the perpetrator whether he was *Larry* Bell (and that Judge did so) and Judge's testimony that Dorton told her to ask the perpetrator whether he was *Ronnie* Bell (and that Judge did so). This discrepancy, which was presented to the jury at petitioner's trial, "does not constitute ' "new evidence" that fundamentally undermines the judgment' " (*In re Clark, supra*, 5 Cal.4th at p. 798, fn. 33), nor does it establish that his conviction was the product of false testimony (*In re Roberts, supra*, 29 Cal.4th at p. 744). Both witnesses identified petitioner as the murderer at trial and continued to identify him at the reference hearing. The referee found that both witnesses were credible in their identification of petitioner as the murderer, and we accept that finding as well.

In sum, the record falls far short of establishing either that petitioner is actually innocent of the crimes for which he was convicted or that his criminal convictions were tainted by false testimony.

DISPOSITION

Our order to show cause was limited to the claims that petitioner was actually innocent of the crimes at Wolff's Jewelry Store and that his convictions were the unlawful product of false testimony. Bell's other claims and his petition for writ of habeas corpus will be resolved by a separate order, as is our practice. (See *In re Freeman, supra*, 38 Cal.4th at p. 652.) The order to show cause is discharged.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.