Filed 8/26/16  In re Westley CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re TRAVIS DANIEL WESTLY on Habeas Corpus. | D067658 |
| _____ | (Super. Ct. No. RIC1307447) |
| In re RICHARD DUGAN et al on Habeas Corpus. | D068179 |
| | (Super. Ct. No. RIC131624) |

Original proceeding on a petition for writ of habeas corpus.  Relief denied.

E. Thomas Dunn, Jr., for petitioner Travis Daniel Westly.

Law Offices of Paul Grech, Jr., Paul Grech, Jr., Trenton C. Packer; and Jennifer A. Gambale, under appointment by the Court of Appeal, for petitioner Richard Dugan.

Edward J. Haggerty, under appointment by the Court of Appeal, for petitioner Jonathan Morgan.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Scott C. Taylor and Meredith S. White, Deputy Attorneys General, for Respondent.

A jury convicted Travis Daniel Westly, Richard James Dugan, and Jonathan Richard Morgan (Westly, Dugan, and Morgan collectively Petitioners) of second degree murder (Pen. Code,[1] § 187, subd. (a)).  The jury also found true a gang benefit enhancement allegation.  (§ 186.22, subd. (b).)  The trial court sentenced each defendant to prison for an indeterminate term of 15 years to life.  We affirmed each of their convictions on appeal.  (See *People v. Dugan* (July 6, 2011, D058093) [nonpub. opn.], review denied Oct. 12, 2011, S195509.)

Westly filed a petition for writ of habeas corpus.  Dugan and Morgan filed a joint petition for writ of habeas corpus.  Among other issues, Petitioners contend they did not receive the victim's medical records.  Petitioners argue that either their respective counsels were prejudicially ineffective in failing to obtain the medical records or the prosecution committed *Brady*[2] error in failing to timely produce the medical records.

After consolidating all the petitions, we determined that Petitioners' entitlement to relief hinges on the resolution of certain factual disputes and ordered the presiding judge of the superior court to appoint a special master to hold an evidentiary hearing and make findings of fact in response to 30 enumerated questions.  The special master produced a report, which was accompanied by written responses from the People and the Petitioners.  The special master determined that the prosecution did not commit *Brady* error and each of the Petitioners' attorneys was not ineffective.

---

1    Statutory references are to the Penal Code unless otherwise specified.
2    *Brady v. Maryland* (1963) 373 U.S. 83.

We independently reviewed the evidence and agree with the special master's factual findings. We also independently determine that the Petitioners did not receive prejudicially ineffective representation from their trial counsel.

In addition, the Petitioners claim that their second degree murder convictions cannot stand in light of *People v. Cravens* (2012) 53 Cal.4th 500 (*Cravens*). We reject this contention.

Finally, Morgan argues his trial counsel was prejudicially ineffective for failing to object to a certain jury instruction. We find no merit in Morgan's argument.

As such, we deny the requested relief.

PROCEDURAL AND FACTUAL BACKGROUND

We take the factual background of the Petitioners' second degree murder offense from our previous opinion affirming their convictions. We omit discussion of the facts relating to the gang allegations as they are not relevant to the issues before us.

"In June 2006 Steven Forsythe, [Victor] Sanchez, and Morgan drove in Forsythe's truck to a fast-food restaurant to get some food, hang out with friends, and possibly talk to some girls. When they arrived at the restaurant, there were approximately 20 people standing outside in the parking lot, including [Sean] Gardhouse and Robert Lucero. Most of the people were members of a group known as Southern California Riders or SoCal Riders (SCR). Gardhouse and Lucero were talking to the SCR group members.

"As Forsythe, Sanchez, and Morgan were walking into the restaurant, the SCR group approached them and started shaking their hands. When Morgan refused to shake hands with a short Hispanic man in the group, the man became angry. After Forsythe,

3

Sanchez, and Morgan went inside the restaurant, the man stood outside the restaurant with the SCR group. He yelled and swore at the three men, banged on the window, and challenged them to come outside and fight.

"Forsythe, Sanchez, and Morgan were scared because they were outnumbered. As Forsythe ordered food, Sanchez and Morgan used their cell phones to call for backup. Sanchez called Westly. The three men then waited inside the restaurant for their backup to arrive.

"Meanwhile, the SCR group left. Gardhouse and Lucero left as well. Approximately five minutes later, Westly, [Jimmy] Gulley, and several other men arrived at the restaurant and went inside. Not long afterwards, Dugan and another group of approximately 10 men also arrived at the restaurant and parked by Westly and his group. Dugan went inside the restaurant and briefly chatted with Westly. He then went outside and stayed with his group in the parking lot.

"Westly sat down with Forsythe, Sanchez, and Morgan. Sanchez told Westly about their encounter with the short Hispanic man and their concern for their safety. Westly and Gulley then left the restaurant and stood outside the building, away from the parking lot, talking. Forsythe, Sanchez, and Morgan left a short time later and went out to the parking lot.

"By then, Gardhouse and Lucero had returned to the parking lot to meet Gardhouse's girlfriend. Forsythe, Sanchez, Morgan, and as many as 15 to 20 others, including Dugan, approached Gardhouse to talk to him about the incident with the short Hispanic man. Forsythe, Sanchez, and Morgan greeted Gardhouse and shook his hand.

4

Gardhouse stood in front of his truck with his back toward it. Forsythe, Sanchez, Morgan and the men with them stood in a semicircle around Gardhouse.

"Someone in the group aggressively asked Gardhouse, 'Do you have problems with the El Cerrito Boys?' Gardhouse responded, 'No I don't.' Sanchez asked in a short, angry tone why Gardhouse had been with the SCR group earlier. Gardhouse responded that he was not with SCR and '[did] not roll with that crew.' Sanchez then asked Gardhouse if he knew the Hispanic man. He also asked Gardhouse where the man was. Gardhouse said he knew him, but not well and did not know anything about the earlier incident. Sanchez remarked, ' hope you're not lying to me,' or, 'Don't lie to me.'

"At this point, someone in the group yelled, 'El Cerrito' and another person yelled, 'Just hit him.' A few seconds later, Dugan emerged from the group and stepped in front of Sanchez. He said 'EC Boys, send this message to SCR' and punched Gardhouse in the face. The punch bloodied Gardhouse's mouth and caused him to fall backward onto the hood of his truck.

"Gardhouse pulled himself up and held his face. He looked dazed and scared. Sanchez told him to 'wipe the blood off [his] mouth and get back over here and talk to me.' Gardhouse said he did not want any trouble and was not going to fight. He turned and started walking toward the passenger side door of the truck just as Lucero, who had been sitting in the passenger seat, was getting out to help him. Approximately four or five men in Sanchez's group, including Dugan and Morgan, rushed Gardhouse and Lucero. Lucero put his hands up and said, 'Whoa, what are you doing.' Morgan

5

approached Lucero and hit him in the head.  Lucero backed up, but Morgan continued toward him and hit him in the head a second time.

"At the same time, someone said 'hit him' and 'f —— him up' as another person hit Gardhouse again two or three times.  Gardhouse turned, stumbled, and headed quickly toward the front door of the restaurant still holding his face.  When Gardhouse reached the front of the restaurant, his mouth was bleeding and he looked scared.  He asked to be let inside the restaurant and he tried to open the doors, but could not get inside because the restaurant employees held the doors closed.

"While people chanted 'El Cerrito' and 'hit him,' Westly approached Gardhouse from behind and asked him, 'What's going on?'  Before Gardhouse responded, Westly grabbed him and pushed him into the door.  Blood from Gardhouse's face spattered on the door.  Westly pulled Gardhouse back forcefully and struck him two to four times in the face with 'extremely vicious' blows.  Gardhouse's eyes rolled to the back of his head as Westly either threw him to the ground or he fell backward.  Gardhouse did not attempt to catch himself and his head hit the ground with a loud thud.  Forsythe could tell Gardhouse was seriously injured from the sound of Gardhouse's head hitting the ground.

"While Westly attacked Gardhouse, Morgan stood in front of Lucero in 'fight mode.'  After Gardhouse hit the ground, Westly, Sanchez, Forsythe, Dugan, and the others with them fled.

"A short time later, a police officer arrived at the restaurant and found Gardhouse lying on the ground near the restaurant door with his head in a large pool of blood.  His

6

eyes were rolled back and he was convulsing. Gardhouse never regained consciousness and died several days later.

"The forensic pathologist who performed Gardhouse's autopsy testified Gardhouse had a laceration approximately one-quarter inch deep on the bridge of his nose, an abrasion on the back of his head, one on the side of his chin, and another on his elbow. He also had multiple brain contusions, primarily in the front, and a skull fracture over his left ear. The skull fracture could have been caused by a single blow to his head or by a fall on the left side of his head. It also could have caused him to lose consciousness. He died from blunt force craniocerebral trauma. The injury was contrecoup, meaning the front part of his brain was injured from rebounding into the front of his skull from the impact to the back of his head."

The Petitioners appealed their convictions, raising issues involving substantial evidence and allegedly improper jury instructions. We affirmed the judgments.

Westly filed a petition for writ of habeas corpus in superior court, which the court denied. Dugan and Morgan filed a pleading entitled "Motion to Recall the Remittiturs (after lower court denied without hearings)" directly with this court. We treated that pleading as a petition for writ of habeas corpus and denied the petition without prejudice so Dugan and Morgan could file it in the Riverside County Superior Court in the first instance. Dugan and Morgan did so, and the superior court denied the petition.

Westly subsequently filed a petition for writ of habeas corpus with this court, wherein he raises four issues. First, he claims that newly discovered evidence consisting of Gardhouse's medical records showed that Westly did not cause Gardhouse's death by

7

punching him. Second, Westly's trial counsel was prejudicially ineffective for failing to obtain, consider, and use the medical records. Third, the prosecutor committed a *Brady* violation by failing to produce the medical records to Westly's trial counsel. Fourth, in light of *Cravens*, *supra*, 53 Cal.4th 500, Westly could not be convicted of second degree murder.

We requested an informal response to the petition from the People.

A few months later, Dugan and Morgan filed a joint petition for writ of habeas corpus. In that petition, Dugan and Morgan claim a number of jury instruction related errors. In addition, they raise the same issues in regard to Gardhouse's medical records as argued by Westly.

After considering the People's informal response to Westly's petition for writ of habeas corpus, we issued an order to show cause why relief should not be granted. We then consolidated Dugan and Morgan's case with Westly's case, and issued an order to show cause why relief should not be granted as to their joint petition as well. In doing so, we also directed that counsel be appointed for Dugan and Morgan.

Because of the Petitioners' claim of a *Brady* violation, we determined that their entitlement to relief depended on the resolution of factual disputes and an evidentiary hearing was necessary. (§ 1484; *People v. Romero* (1994) 8 Cal.4th 728, 739-740.) To this end, we ordered the presiding judge of Riverside County Superior Court to appoint a judge to serve as special master and hold an evidentiary hearing to take evidence in response to 30 specific questions and make appropriate findings of fact to answer those questions.

Prior to the special master issuing its report, the People filed a return to the order to show cause as to Westly. In the return, the People argue Westly's trial counsel had Gardhouse's medical records prior to trial, the medical records do not "undermine the entire prosecution case and point unerringly to innocence or reduced culpability" (*In re Hardy* (2007) 41 Cal.4th 977, 1016), Westly's counsel was not prejudicially ineffective, and Westly is not entitled to relief under *Cravens*, *supra*, 53 Cal.4th 500. Westly filed a traverse.

Also, before the special master filed his report, both Dugan and Morgan filed supplemental petitions for writ of habeas corpus. In Morgan's supplemental petition, he raises four issues: (1) his trial counsel was prejudicially ineffective for failing to retain and consult a medical expert to review Gardhouse's medical records as well as failing to present additional evidence as to Gardhouse's cause of death; (2) the medical examiner's testimony regarding Gardhouse's cause of death was false evidence requiring the reversal of judgment; (3) Morgan's trial counsel was prejudicially ineffective for failing to object to the modified CALCRIM No. 375 jury instruction; and (4) Morgan's conviction of second degree murder should be reduced to involuntary manslaughter under *Cravens*, *supra*, 53 Cal.4th 500. Dugan's supplemental petition mirrors the arguments made in Morgan's supplemental petition except that Dugan does not claim his counsel was ineffective for failing to object to the modified CALCRIM No. 375 jury instruction.

The People filed a joint return to Dugan's and Morgan's supplemental petitions, making similar arguments as contained in the return to Westly's petition. Morgan and Dugan filed separate traverses.

9

Prior to Morgan and Dugan filing their traverses, but after the People filed their joint return, the special master filed a report detailing his findings of fact and response to our 30 questions. The special master explained that each party was invited to provide the special master with his proposed answers to our 30 questions along with any evidence they believed supported those answers. The special master received responses from the People and a combined response from the Petitioners.[3] The special master then met with all counsel, and it was agreed that the special master did not need any further evidence. But for the People's objection to a small portion of the Petitioners' expert witness's declaration, the parties submitted the matter. The special master based his findings of fact and responses on declarations and other documentary evidence the parties submitted.

The special master made the following findings. Westly originally was represented by Anthony Sessa, later by Samuel Diaz, and finally by his trial counsel, Brent Romney. Sessa declared that he subpoenaed Gardhouse's medical records, but the special master found it "very slightly more likely than not that Sessa's recollection is mistaken and that he did not subpoena the records." The special master noted that there is no documentation to support Sessa's claim that he subpoenaed the records. In addition, it was undisputed that Sessa never received the medical records.

The special master found that the prosecutor subpoenaed Gardhouse's medical records. The custodian of records for Riverside Community Hospital produced the records to the superior court on July 19, 2007. The court received them on the same date.

---

3    The parties' respective responses were filed in this court with the special master's report.

The superior court's exhibit clerk released the subpoenaed records to Department 63 of the superior court on August 9, 2007.

At a hearing held on August 9, 2007, the court ordered "subpoenaed documents released to [the prosecutor] to make copies for all parties." However, at this same hearing, Sessa was relieved as counsel and replaced by Diaz, a "Conflict Defense Lawyers" (CDL) attorney.

The prosecutor's office complied with the court order and made Gardhouse's medical records available to all counsel on August 28, 2007. Steven Harmon, Dugan's trial counsel, admitted that he received discovery from the prosecutor's office on September 5, 2007, about a year before Dugan's trial. Included in the discovery was Gardhouse's medical records. In addition, Thomas Welbourn, Morgan's trial counsel, admitted that he possessed Gardhouse's medical records prior to trial.

Romney declared that he first obtained Gardhouse's medical records posttrial on January 5, 2012. However, according to the prosecution's discovery receipts, a representative from Diaz's office picked up the discovery, including the medical records, on September 4, 2007. At that time, Diaz was the attorney of record for Westly. Nevertheless, Romney claims when he received Westly's defense files from Diaz, Gardhouse's medical records were not included.

The special master also noted there is a dispute in the evidence presented regarding a conversation that allegedly occurred between Romney and Deputy District Attorney John Aki. Romney declared that he specifically requested Gardhouse's medical records from Aki, and Aki informed him that there were no medical records in the

11

prosecutor's file. Romney stated that in regard to Gardhouse's medical history, his primary concern was whether alcohol or illegal drugs had been detected in Gardhouse's blood at the time he was admitted to the hospital. Because the pathologist's report referred to the medical records as showing no alcohol or illegal drugs were in Gardhouse's blood, he decided not to subpoena the medical records.

Aki's recollection differed significantly from Romney's. Aki recalls no conversation with Romney before trial wherein Romney asked for a copy of Gardhouse's medical records. Aki stated that if Romney had asked for the medical records, he would have provided him with them.

The special master found, "[b]ased on all the empirical evidence, it seems more likely than not that Romney had the records, and would not have contacted . . . Aki to obtain them."

The special master also concluded that the prosecution did not violate its disclosure obligations under *Brady*. The prosecution complied with its discovery obligations by making and providing copies of Gardhouse's medical records to all defendants well before trial. Further, the special master found, "It is incredible that Mr. Romney was the only attorney *not* to have received the records, particularly since the records had been picked up from the District Attorney's office by an apparent representative of Westly's prior attorney, Sam Diaz. Any suggestion that the District Attorney supplied the records to the two co-defendants, but chose to withhold them from Romney and Westly, is not credible. There is no evidence to suggest that the People hid, or attempted otherwise to conceal, the medical records."

12

The special master next addressed whether the Petitioners' respective trial counsel's representation of Petitioners fell below an objective standard of reasonableness under prevailing professional norms in the Riverside legal community because they did not retain a medical expert witness to offer testimony about Gardhouse's medical records and cause of death. In answering this question in the negative, the special master noted that the answer depended "entirely on the significance of those records and what they would have revealed to the experienced trial practitioner." The special master found that the three trial counsel who stated they reviewed Gardhouse's medical records before trial (Aki, Harmon, and Welbourn) were "highly experienced in the trial of homicide cases" and "among the most experienced in the Riverside legal community." Further, the special master found persuasive that none of these attorneys "saw anything in the records that would have alerted them to conduct further investigation." Instead, these attorneys did not view the records as significant except "as to whether the victim had drugs or alcohol in his system."

Also, the special master was not persuaded by the Petitioners' expert witness, Dr. Marco Vitiello, that he should reach a different conclusion. The special master found that Dr. Vitiello's declaration did not indicate that "inadequate medical treatment" of Gardhouse while he was in the hospital was the "sole or even primary cause of death." As such, the special master concluded the defense counsel had no duty to engage a medical expert for trial.

After the special master produced his report, all the parties except Morgan submitted supplemental letter briefs commenting on the report.

13

DISCUSSION

I

*GARDHOUSE'S MEDICAL RECORDS*

Petitioners make several arguments involving Gardhouse's medical records. They claim their counsel were prejudicially ineffective for failing to hire a medical expert to review the records and present further evidence as to the cause of Gardhouse's death. They also claim the medical records show that the prosecutor offered false evidence at trial when he offered the testimony of Dr. Mark Fajardo that Gardhouse's cause of death was blunt force trauma to his head. Westly also argues that the prosecution committed a *Brady* violation by failing to produce Gardhouse's medical records to him.

A. The Special Master's Findings

Here, we determined that the Petitioners' entitlement to relief hinges on the resolution of factual disputes; thus, we ordered an evidentiary hearing. (§ 1484.) However, "[b]ecause appellate courts are ill-suited to conduct evidentiary hearings," we ordered the superior court to appoint a special master to take evidence and make findings of fact responsive to 30 enumerated questions. (See *People v. Romero*, *supra*, 8 Cal.4th at p. 740.)

The special master took evidence and presented a report containing findings of fact and answering the questions we presented. We also have the benefit of the Petitioners' and the People's respective responses to our questions and their supporting evidence. On review, we are not bound by the factual determinations made by the special master, but we independently evaluate the evidence and make our own factual

14

determinations.  (*In re Resendiz* (2001) 25 Cal.4th 230, 249; *In re Wright* (1978) 78 Cal.App.3d 788, 801.)  Nevertheless, any factual determinations made by the special master "are given great weight when supported by substantial evidence."  (*In re Marquez* (1992) 1 Cal.4th 584, 603.)  Although the deference accorded these factual findings originates from a special master's opportunity to observe live testimony (see *ibid.*), we will defer to a special master's findings of fact, even in the absence of live testimony, if the findings are supported by substantial and credible evidence.  (See *In re Hitchings* (1993) 6 Cal.4th 97, 109.)

As an initial matter, we note that Westly takes issue with the fact that the special master made credibility determinations when no live witness testimony was heard.  He claims that he did not expect the special master would need to make credibility determinations when he stipulated that no live testimony was needed.  We find Westly's after the fact challenge to the procedures he agreed to puzzling.

We sent this matter back to the superior court so a special master could be appointed to make factual determinations.  It logically follows that in making factual determinations, the special master would have to resolve credibility issues.  After all, one of the issues to be decided was whether the prosecutor committed a *Brady* violation.  One could expect that such a decision would entail the special master evaluating conflicting evidence.  In short, it should come as no surprise to anyone that a special master asked to take evidence relevant to a petition for writ of habeas corpus claiming the prosecutor did not provide proper discovery would make credibility determinations, especially

15

considering the dispute here. Westly's astonishment that the special master actually did so is not well taken.

Further, Westly implies that it is improper for a special master to make credibility determinations based only on declarations and documentary evidence. To the contrary, a fact finder may make credibility determinations and resolve factual conflicts on the basis of declarations. (See *People v. Johnson* (2013) 222 Cal.App.4th 486, 499; *People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1463-1464.) Indeed, in this matter, to the extent there is conflicting evidence presented by declaration and we are independently reviewing it, we too will make appropriate credibility determinations when necessary.

### 1. Purported *Brady* Violation

Under *Brady*, " 'the prosecution must disclose to the defense any evidence that is "favorable to the accused" and is "material" on the issue of either guilt or punishment.' [Citation.] Under *Brady*, 'Evidence is "favorable" if it either helps the defendant or hurts the prosecution, as by impeaching one of its witnesses. [¶] Evidence is "material" "only if there is a reasonable probability that, had [it] been disclosed to the defense, the result . . . would have been different." ' " (*Kennedy v. Superior Court* (2006) 145 Cal.App.4th 359, 367.)

Here, the subject evidence is Gardhouse's medical records. Westly argues that the prosecution violated *Brady* by failing to produce those records to him. However, the

special master made factual findings that undermine Westly's position.[4]  Specifically, the special master found:  (1) the prosecutor's office made Gardhouse's medical records available to all counsel on August 28, 2007; and (2) a representative of Diaz, Westly's attorney at the time, picked up the records on September 4, 2007.  We agree with the special master that the evidence supports both these findings.

The People produced three discovery receipts dated August 28, 2007.  All of them reference the underlying criminal case number for Riverside County Superior Court.  The receipts indicate that the prosecution was producing one CD with documents bates labeled 2654 through 3375.  Gardhouse's medical records were bates labeled 2879 through 3375; thus, they would have been contained on the CD.  In the receipt for Westly, Diaz is listed as the "Conflict Panel Att[orne]y" who is representing Westly.  There is a signature that indicates a CD was picked up on behalf of Diaz on September 4, 2007.  The discovery receipts also indicate that representatives for both Morgan's and Dugan's counsel picked up a CD.  There is no dispute that both Morgan and Dugan had Gardhouse's medical records well before trial.

Westly does not disagree that a CD was made available for Diaz to pick up or that a runner for CDL picked up a CD on September 4, 2007, but he asserts there is no evidence that the CD ever made it to Diaz.  Further, Westly points out that his trial counsel, Romney, declared that he never received copies of Gardhouse's medical records

---

4    It is undisputed that Morgan and Dugan both received Gardhouse's medical records well before trial.  Neither petitioner claims there was a *Brady* violation here as to them.

17

when he was appointed counsel for Westly and received Westly's "defense file, evidence and discovery from prior defense counsel[.]" Nevertheless, Romney does admit that he believes a CD with Gardhouse's medical records was given to "a conflict defense attorney not associated with me or my office at the time." Therefore, based on this evidence, it is undisputed that the prosecutor copied Gardhouse's medical records and those records were picked up by representatives of all three petitioners in early September 2007.

Despite Romney's admission that the prosecutor did produce Gardhouse's medical records to Westly's previous counsel, Westly maintains a *Brady* violation exists because Romney asked Aki for a copy of Gardhouse's medical records and Aki did not provide him with one. In a declaration, Romney asserts he asked Aki if Aki had a copy of Gardhouse's medical records, but was told by Aki that he did not. Romney claims he only received Gardhouse's medical records on January 5, 2012, after he subpoenaed those records well after the jury rendered its verdict in Westly's trial.

Here, Westly argues that Romney's declaration is undisputed. In other words, Romney's declaration conclusively establishes that the prosecutor failed to produce Gardhouse's medical records to him. We disagree.

In making his argument, Westly fails to appreciate the many inconsistencies in the two Romney declarations on which he heavily relies. In his declaration dated April 13, 2013, Romney claims to have had conversations with Aki prior to trial in which Aki told him that no alcohol or drugs had been found in Gardhouse's blood when he was admitted to the hospital. He also notes that on October 24, 2008, the jury began its deliberations and returned a guilty verdict on October 27, 2008. Romney declares "on or about

18

October 19, 2011," he met with members of the clerk's office of the superior court and asked to see Gardhouse's medical records. It was then that Romney states he learned that the records were sent to Department 63 and ultimately turned over to the prosecutor. Romney indicates that the member of the clerk's office did not have the original subpoenaed medical records or a photocopy of those records. Romney then declares that, "[a]t about the same time (October, 2011)," he spoke with Aki and asked if he would check if the prosecution's case file had copies of Gardhouse's medical records. According to Romney, on October 28, 2011, Aki told him that he did not recall seeing the medical records, but he had ordered the file from storage. He further claims that on November 18, 2011, Aki informed him that he did not find Gardhouse's medical records in the prosecutor's file.

Based on Romney's declaration dated April 13, 2013, it is unclear that Romney ever asked Aki or anyone else on the prosecution's team for Gardhouse's medical records prior to trial. Instead, it appears that he asked if Aki had those records in his file sometime in October 2011 (almost two years after trial).

Westly also relies on a subsequent Romney declaration dated almost a year later on March 27, 2014. Romney tells a different narrative in that declaration. According to Romney, he did not find Gardhouse's medical records when he received Westly's defense file, evidence, and discovery from prior defense counsel. He indicates he was concerned about the presence of alcohol or drugs in Gardhouse's blood when he was admitted to the hospital. He declares that he "personally inquired" of Aki if he had copies of Gardhouse's medical records in his file to which Aki told him that he did not. Romney then states

19

that, after Westly was sentenced, he "learned for the first time from the Riverside County Superior Court clerk's office that the subpoenaed medical records of [Gardhouse] had been released to [the prosecutor] to make copies at the conclusion of the preliminary hearing, but the medical records had not been returned to the clerk's office." After learning this, Romney declares that he asked Aki again if the records were in the prosecution's file. Aki responded that he had reviewed the file and did not find Gardhouse's medical records. In addition, Romney states that he learned from the pathologist's report that there was no alcohol or drugs in Gardhouse's blood when he was admitted to the hospital so he did not attempt to subpoena Gardhouse's medical records prior to trial.

We note a few important inconsistencies between Romney's two declarations. In the earlier declaration, Romney claims to have learned about the lack of drugs or alcohol in Gardhouse's blood from conversations with Aki, but in the later declaration, Romney states that he learned this information from the pathologist's report. If Romney was aware of this information from the pathologist's report, he would have had no reason to ask Aki if there was drugs or alcohol in Gardhouse's blood when he was admitted to the hospital. In the April 13, 2013 declaration, Romney does not mention asking Aki for Gardhouse's medical records prior to trial. Instead, he asked Aki if those records were in the prosecution file nearly two years after trial. In the March 27, 2014 declaration, Romney states that he had asked Aki if he had Gardhouse's medical records in his file, but it is not clear when he actually did so. Because he discusses this conversation in the

20

same paragraph as he mentions receiving the defense file for Westly, the implication is that Romney asked Aki for the records prior to trial.

In addition to these inconsistencies, we note that Romney does not provide a clear statement regarding when he first asked Aki for Gardhouse's medical records. His first declaration indicates that he did not do so until well after the trial concluded. The second declaration implies that the inquiry occurred at some point near in time to Romney receiving the defense file for Westly, but we find this evidence less than clear that Romney did indeed ask for Gardhouse's medical records before trial.

In evaluating Westly's evidence, we also consider Aki's declaration dated February 18, 2016. In Aki's declaration, he "clearly recalls" talking to Romney about Gardhouse's medical records several years after trial, but his recollection of their conversation differs from Romney's. Aki declares that he did not tell Romney that the records were not in the prosecution file. Instead, he told Romney that the records were not in his working file and he would have to order the full prosecution file from storage to locate the records for him. According to Aki, Romney shortly thereafter told him that he had obtained a copy of Gardhouse's medical records so Aki did not order the full prosecution file.

In his declaration, Aki states that he did not recall having any pretrial conversation with Romney about the hospital's testing of Gardhouse's blood. He also declares that he did not recall any pretrial conversation with Romney wherein Romney asked him for a copy of Gardhouse's medical records. That said, Aki asserts that if Romney had ever indicated that he did not possess the records, he would have provided copies to him.

21

Relying on *People v. Johnson* (1992) 3 Cal.4th 1183, Westly insists that we cannot rely on Aki's declaration to contradict Romney's declarations. *Johnson*, however, does not prevent us from relying on Aki's declaration here. Among other issues in that case, the court addressed when a prior inconsistent statement of a witness can be admitted into evidence if that witness's memory falters on the witness stand. (*Id*. at pp. 1218-1220.) *Johnson* is not instructive here.

Here, like the special master, we find Aki's declaration more credible than Romney's declarations. Although Aki does not recall a conversation wherein Romney asked him for a copy of Gardhouse's medical records prior to trial, we are persuaded that if Romney had asked for them, Aki would have produced them. This conclusion is supported by the undisputed fact that the prosecution had subpoenaed, copied, and made available copies of Gardhouse's medical records to the Petitioners, including Westly's previous counsel. Both Dugan's and Morgan's counsels admit that they had the records well before trial. We find absolutely no reason why Aki would refuse to produce Gardhouse's medical records if Romney had asked for them.

Further, Westly's evidence is less than clear in establishing Romney asked for the medical records before trial. Indeed, at best, it is ambiguous as to when Romney even asked for such records. In his April 13, 2013 declaration, Romney does not state that he asked for the records prior to trial. Instead, it appears he first asked Aki for them almost two years after trial. In his subsequent declaration, almost a year later, Romney states that he asked for Gardhouse's medical records, but there is no clear indication when he

22

actually did so. In short, we do not find Romney's declarations established that he asked for the records before trial.

In addition, we note that Romney states he never received Gardhouse's medical records from the prosecution. He received them on January 5, 2012, in response to his subpoena.

Westly's appellate counsel, E. Thomas Dunn, also submitted a declaration in support of the petition for writ of habeas corpus. In that declaration, Dunn details his efforts to obtain Romney's defense file for Westly. Dunn states that when he eventually obtained the file, it actually consisted of "four large file boxes full of materials, and most of their contents were in total disarray, unorganized, and stuffed in the boxes in no particular order." Dunn further declares he learned that Romney had obtained Gardhouse's medical records. He and an assistant subsequently reviewed the boxes of files obtained from Romney and "eventually discovered and pieced together the medical records that are now being submitted to this court as Exhibit N." The medical records found at Exhibit N to Westly's petition for writ of habeas corpus bear the bates labels 2883 through 3375. The prosecution bates labeled Gardhouse's medical records with the numbers 2879 through 3375. Thus, it appears the medical records submitted by Westly are actually the same as those that were produced by the prosecution well before trial. In other words, ironically so, an exhibit submitted by Westly in support of his petition undermines the existence of the very *Brady* error he claims occurred.

With these factual findings, we independently agree with the special master that "[i]t is incredible that Mr. Romney was the only attorney *not* to have received the

23

records[.]"  In short, Westly has not shown that the prosecution violated *Brady* by failing to produce to him Gardhouse's medical records.

## 2.  Ineffective Assistance of Counsel

Petitioners claim they each received prejudicially ineffective representation from their trial counsel because their trial counsel did not obtain a medical expert to review Gardhouse's medical records and challenge the victim's cause of death.  We disagree.

To show that trial counsel's performance was constitutionally defective, an appellant must prove:  (1) counsel's performance fell below the standard of reasonableness under prevailing professional norms, and (2) the "deficient performance prejudiced the defense."  (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688 (*Strickland*).)  It is the defendant's burden to prove the inadequacy of trial counsel. Competency is presumed unless the record affirmatively excludes a rational basis for trial counsel's choice.  (*People v. Ray* (1996) 13 Cal.4th 313, 349; *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1260.)

The United States Supreme Court explained that "[j]udicial scrutiny of counsel's performance must be highly deferential [because] [i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."  (*Strickland*, *supra*, 466 U.S. at p. 689.)  Thus, the court explained, reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under

24

the circumstances, the challenged action 'might be considered sound trial strategy.' " (*Ibid.*; see *People v. Lucas* (1995) 12 Cal.4th 415, 437, quoting *Strickland*, *supra*, 466 U.S. at p. 689 ["[T]here is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' "].) We reverse on the ground of inadequate assistance only if the record affirmatively discloses no rational tactical purpose for counsel's act or omission. (*Lucas, supra,* at pp. 436-437.)

Here, the Petitioners' respective claims of ineffective assistance are slightly different. Westly claims Romney was prejudicially ineffective because he did not (1) obtain Gardhouse's medical records prior to trial, (2) review the records before trial; (3) retain a medical expert to review the records; and (4) present medical expert testimony at trial as to the cause of Gardhouse's death. Morgan and Dugan argue their respective trial counsel were ineffective based on the latter two reasons only as there is no dispute that their counsel possessed and reviewed the medical records before trial.

As a threshold matter, we observe Petitioners do not offer any declaration from an attorney in the Riverside legal community who reviewed Gardhouse's medical records and opined that he or she, based on his or her review of those records, would have hired a medical expert to further investigate Gardhouse's cause of death and present expert testimony challenging his cause of death at trial. Indeed, Romney submitted three declarations in support of Westly's petition here, and he never stated in any of them that had he reviewed the medical records before trial, he would have retained a medical expert

25

to investigate and challenge the victim's cause of death. At best, Petitioners offer a

declaration from Dr. Vitiello[5] wherein he opines as to the following:

> "I believe that the events beginning on June 27th and continuing the following day as reflected in the hospital records were clear and absolute indications that should cause any experienced and competent legal professional handling homicide cases, where causation is part of the proof required, to be concerned about the actual cause of death. The specific facts of this case, as contained in the record, should have caused competent legal counsel to seek a medical expert's opinion to ensure the cause of death was correctly discerned in order to properly and effectively defend against the criminal charges. Cases where an expert's opinion are necessary are the exception. However, in a case such as this, where the medical records of the decedent victim provide such clear indications that death six days after hospital admission was unusual and unexpected, especially in view of the Glasgow scale obtained at the time of admission, trying the case without the benefit of a medical expert's oversight and opinion would lead to ineffective counsel. In this particular case, it appears to have resulted in a conviction and life sentence for a defendant who simply did not cause the victim's death."

However, there is no indication in the record that Dr. Vitiello is qualified to offer

an expert opinion as to the proper standard of reasonableness of a criminal defense

attorney trying a homicide case in Riverside County. Indeed, there is no indication

whatsoever anywhere in his three declarations that he has any familiarity whatsoever

regarding how "any experienced and competent legal professional handling homicide

cases" would have handled the subject trial. There is no evidence in the record that Dr.

Vitiello is a practicing attorney or otherwise ever tried a homicide case. There is no

evidence that he has even testified in a criminal case in Riverside County, or any other

---

[5] Petitioners actually submitted three declarations from Dr. Vitiello. The first dated April 10, 2013, the second dated March 25, 2014, and the third dated February 19, 2016.

26

jurisdiction for that matter. In short, Dr. Vitiello is in no way qualified to render an opinion as to whether Petitioners' counsels' performance fell below the applicable standard of reasonableness. As such, we disregard this portion of Dr. Vitiello's declaration in its entirety.

In stark contrast to the lack of any evidence presented by Petitioners on this issue, the People offered extensive and persuasive evidence undermining Petitioners' theory that their counsels' representation of them fell below the appropriate standard of reasonableness. For example, the People submitted the declaration of Harmon, trial counsel for Dugan. Harmon has been practicing criminal law for 43 years and conducted over 350 felony jury trials, including many murder cases. He is currently the Public Defender of Riverside County. Before trial, Harmon thoroughly reviewed Gardhouse's medical records as well as the autopsy report and neuropathology report. According to Harmon, the records and reports were consistent and there were no indications that the cause of Gardhouse's death was anything other than blunt force trauma to the head. Harmon also states that there was no indication of any grossly improper medical care of Gardhouse, "much less any indicators that the blunt force trauma sustained by Mr. Gardhouse was not a substantial factor causing his death." Further, Harmon states that there was nothing in Dr. Vitiello's first two declarations[6] that caused him to reconsider his approach in this case. Harmon also explains that his trial strategy was to distance Dugan from Westly and present evidence that Dugan did not know and could not

---

6    At that time Harmon signed his declaration, Petitioners had yet to submit Dr. Vitiello's third declaration.

27

reasonably have known what Westly was going to do to Gardhouse. Harmon concludes, "[i]t is my opinion that, given the legal standards and the facts of this case, and based upon my trial experience, any approach other than this strong, straightforward, and plausible defense to the murder charge would have been unproductive."

The People also offered a declaration from Welbourn, who represented Morgan at trial. Welbourn has been practicing criminal law since 1999, first with the Orange County District Attorney's Office, and later, as a private criminal defense attorney. He has represented over 250 defendants and tried over 65 felony jury trials, including murder cases. Like Harmon, Welbourn reviewed the relevant reports and records regarding Gardhouse. He too came to the conclusion that there was nothing in those documents indicating that the cause of Gardhouse's death was anything other than blunt force trauma to the head. He agrees with Harmon that there was no indication of grossly improper medical care of Gardhouse. Welbourn was not persuaded that his legal strategy was wrong based on the first two declarations of Dr. Vitiello.[7] Further, Welbourn indicates that his trial strategy was the same as Harmon's.

Finally, the People presented the declaration of Aki, the lead prosecutor in this case. Aki was admitted to the practice of law in 1997 and is currently the chief assistant district attorney at the Riverside County District Attorney's Office. Previously, he had been assigned to the homicide unit of that office. Aki states that he saw nothing in the records or reports that led him to believe that the cause of death of Gardhouse was

---

[7] At that time Welbourn signed his declaration, Petitioners had yet to submit Dr. Vitiello's third declaration.

28

anything but blunt force trauma to the head. He also saw no indication of grossly improper medical care. Aki declares, "If I had seen any indicators that the cause of death was anything other than blunt force head trauma, I would have consulted on this topic with Dr. Mark Fajardo and sought clarification. However, there were no such indicators, either in the reports or in my conversations with Dr. Fajardo."

In addition, we note that the evidence at trial showed that Gardhouse was struck in the face two to four times with "extremely vicious" blows. Gardhouse's eyes rolled to the back of his head as Westly either threw him to the ground or he fell backward. Gardhouse did not attempt to catch himself and his head hit the ground with a loud thud. The police found Gardhouse lying on the ground in a large pool of blood. Once at the hospital, Gardhouse was treated for his serious head injuries and died five days later. Although Gardhouse's Glasgow coma scale[8] registered at 12 when he was first admitted, it deteriorated to six. In other words, the evidence at trial, at the very least, indicated that blunt head trauma was a substantial factor in Gardhouse's death.

Petitioners caution us that "Courts must take care not to articulate a rule[,] which requires homicide defenders to routinely hire medical experts to assist in their cases." Nevertheless, they argue the instant matter is an exception, "[o]nly where, as here, medical records exist which, on their face, appear to raise questions about the cause of

---

[8]     According to Dr. Vitiello, "[t]he Glasgow Coma Scale is a neurological scale regularly relied upon by medical health professionals treating patients, intended to provide a reliable and objective way of recording the conscious state of an individual for initial and subsequent medical assessment. The Glasgow Coma Scale ranges from fifteen (15), or fully awake, to three (3), or in a deep coma state."

death should the opinion and advice of a medical expert be required." Petitioners' argument mischaracterizes the evidence before us. There is absolutely no evidence in the record that a criminal defense attorney practicing in Riverside County, even an experienced trial attorney who has handled numerous murder trials, could ascertain *on the face* of Gardhouse's medical records that a medical expert was needed to further investigate and challenge the cause of the victim's death.

Applying a highly deferential standard of scrutiny and indulging in a strong presumption that the conduct of Dugan's and Morgan's trial counsel fell within a wide range of reasonable professional assistance, as we must (*Strickland*, *supra*, 466 U.S. at p. 689), we reject Dugan's and Morgan's claims of ineffective assistance of counsel because their trial counsels' decisions not to hire a medical expert and challenge the victim's cause of death were reasonable tactical decisions that we will not second guess. (See *People v. Kelly* (1992) 1 Cal.4th 495, 520.)

Likewise, we find Westly's claim of ineffective representation no more persuasive. Although Westly's counsel, Romney, claims to not have reviewed Gardhouse's medical records before trial, there is no evidence in the record that had he done so, he would have hired a medical expert and challenged the victim's cause of death. Thus, we conclude Westly has not shown that Romney's representation of him fell below an objective standard of reasonableness under prevailing professional norms.

Moreover, even if we had concluded that the Petitioners had satisfied their burden of proving their counsels' performances fell below the standard of reasonableness under prevailing professional norms, their claim of ineffective assistance of counsel would still

30

fail because they cannot show they were prejudiced.  To show prejudice in this context, Petitioners must prove that had their counsel not performed deficiently, there was a reasonable probability that the result of the proceeding would have been different were it not for the error.  (See *Strickland, supra*, 466 U.S. at p. 688.)

Here, Petitioners argue that the three declarations from Dr. Vitiello establish that Gardhouse received grossly negligent medical care, and if that evidence had been presented to the jury, they likely would not have been convicted of second degree murder.  We reject this contention.

" 'If a person inflicts a dangerous wound on another, it is ordinarily no defense that inadequate medical treatment contributed to the victim's death.  [Citations.]  To be sure, when medical treatment is grossly improper, it may discharge liability for homicide if the maltreatment is the sole cause of death and hence an unforeseeable intervening cause.' " (*People v. Scott* (1997) 15 Cal.4th 1188, 1215.)  Improper medical treatment constitutes "gross negligence" when the treatment demonstrates "an extreme departure from the standard of medical care, which . . . [is] the equivalent of 'want of even scant care[.]' " (*Gore v. Board of Medical Quality Assurance* (1980) 110 Cal.App.3d 184, 196, 198.)  In addition, we observe that the prosecution needed only to show that the blunt force head trauma Gardhouse experienced after his beating was a substantial factor contributing to his death.  (See *People v. Catlin* (2001) 26 Cal.4th 81, 155 (*Catlin*).)  With this foundation in mind, we determine that the three declarations of Dr. Vitiello fail to establish Gardhouse received grossly improper medical treatment and that it was the sole cause of his death.

31

Here, it is undisputed that Gardhouse experienced blunt force head trauma that required medical care. Even Dr. Vitiello admits as much in his first two declarations: "Gardhouse suffered blunt force head trauma and absolutely required the subsequent medical attention." Thus, Gardhouse was taken to the hospital and required treatment in the first instance because of the beating he received in June 2006. In other words, the blunt force trauma was the cause of Gardhouse being admitted to the hospital.

As we set forth above, Dr. Vitiello submitted three declarations in this matter. The first is dated April 10, 2013. In that declaration, Dr. Vitiello summarizes some of the medical treatment Gardhouse received. In doing so, however, Dr. Vitiello does not directly comment on the quality of care Gardhouse received for treatment of the blunt force head trauma. He notes some of the treatments, but he does not opine if they were proper in addressing the head trauma. Instead, Dr. Vitiello focuses on the alleged failure of the medical staff to deal with Gardhouse's electrolyte imbalances. This focus results in Dr. Vitiello offering the following opinion as to the cause of Gardhouse's death:

> "Having conducted a thorough and detailed analysis of the Medical Records, it is my conclusion that the cause of Gardhouse's death was, in fact, a cardiac arrhythmia brought on by a serious combination of electrolyte imbalances. While Gardhouse suffered blunt force head trauma and absolutely required the subsequent medical attention, blunt force head trauma did not directly cause his death."

Although Dr. Vitiello offers the conclusion that Gardhouse's cause of death was cardiac arrhythmia, he does not explain how that cause related to the treatment Gardhouse received at the hospital for his blunt head trauma. For example, Gardhouse experienced the cardiac arrhythmia after a craniotomy and hematoma evacuation was

32

performed to treat his head injuries. Also, Dr. Vitiello indicates that Gardhouse received "extraordinary large doses of Mannitol" while he was treated at the hospital, which "would exacerbate electrolyte deficiencies." Dr. Vitiello does not explain if he received too much Mannitol or if Mannitol was an inappropriate treatment for Gardhouse's head trauma. Put differently, Dr. Vitiello's first declaration seems to suggest that the treatment of Gardhouse's head injuries somehow resulted in an electrolyte imbalance ultimately resulting in cardiac arrhythmia. If Mannitol "exacerbates[s] electrolyte deficiencies" as Dr. Vitiello opines, but was necessary to treat Gardhouse's blunt head trauma, then Dr. Vitiello's declaration appears to establish that an electrolyte imbalance was a normal and reasonably foreseeable result of Petitioners' original act. (See *People v. Funes* (1994) 23 Cal.App.4th 1506, 1523-1524 ["We conclude that on the facts of this case the decision to withhold antibiotics was, as a matter of law, not an independent intervening cause. Instead, it was a normal and reasonably foreseeable result of the defendant's original act."], fn. omitted.)[9] In this sense, Dr. Vitiello's declaration does not undermine the cause of death presented at trial: Gardhouse died from blunt force trauma to his head. Also, there is nothing in Dr. Vitiello's first declaration that challenges the conclusion that Gardhouse's blunt force head trauma was a substantial factor contributing to his death. (See *Catlin, supra,* 26 Cal.4th at p. 155.)

---

9    In *People v. Funes*, *supra*, 23 Cal.App.4th 1506, the court determined it was not error for the trial court to refuse to give a special instruction on the proximate cause of the victim's death when the victim suffered blunt force head trauma and died 46 days later after his family and doctors decided to withhold antibiotic treatment. (See *id*. at pp. 1510, 1522-1524.)

In addition, we observe that nowhere in Dr. Vitiello's first declaration does he conclude that Gardhouse received grossly improper medical care and such care was the sole cause of his death. (See *People v. Scott*, *supra*, 15 Cal.4th at p. 1215.)

Petitioners submitted a second declaration from Dr. Vitiello dated March 25, 2014. In that declaration, he explains that he offers the second declaration "to clarify and expound on the direct cause of death of Mr. Gardhouse[.]" Dr. Vitiello adds more detail regarding Gardhouse's electrocardiogram (EKG) and the functioning of his heart and kidneys. Mirroring the opinion in his first declaration, Dr. Vitiello again offers an opinion regarding Gardhouse's cause of death:

> "Having conducted a repeated, thorough and detailed analysis of the Medical Records, it is my conclusion that the cause of Gardhouse's death was, in fact, a cardiac arrhythmia brought on by a serious combination of electrolyte imbalances. These imbalances were not noticed or effectively addressed over an extended period of time. This inaction resulted in a cellular environment[,] which led to the terminal event of a cardiac dysrhythmia. While Gardhouse suffered blunt force head trauma and absolutely required the subsequent medical attention, blunt force head trauma did not directly cause his death. Nothing in the autopsy changes this opinion."

We find Dr. Vitiello's second declaration deficient in many of the same respects as his first. There is no explanation of the quality of treatment Gardhouse received for his head trauma and how that impacted his electrolyte levels that led to his cardiac arrhythmia. The second declaration does not rule out Gardhouse's head trauma as a substantial cause factor contributing to his death. Nor does it offer the opinion that Gardhouse received grossly negligent medical care that was the sole cause of his death.

34

Apparently, not satisfied with his first two declarations, Petitioners submitted a third declaration from Dr. Vitiello. This declaration is dated February 19, 2016. We note it was submitted after the People filed their response to our questions to the special master. Both Morgan and Dugan relied on the third declaration in their respective traverses. Petitioners relied on this declaration in their response to our questions to the special master.

As an initial matter, we find the timing of Dr. Vitiello's third declaration curious. It was prepared and signed almost three years after his first declaration and almost two years after his second. In his third declaration, Dr. Vitiello declared that he has "been asked to opine, clarify and/or elucidate upon my two previous detailed summaries submitted to the courts." We struggle to comprehend why Petitioners would file three declarations from their retained medical expert in this matter when nothing could have possibly changed since Dr. Vitiello submitted his first declaration. There does not appear to be any time pressure evident in the record that would cause Dr. Vitiello to offer his opinions in this piecemeal fashion. Dr. Vitiello's first two declarations were filed with Westly's petition for writ of habeas corpus on February 23, 2015. His first declaration is dated April 10, 2013. His second is dated March 25, 2014. Both of these were drafted well before Westly submitted his petition. Certainly if further opinions were needed from Dr. Vitiello, Westly had ample time to secure them before he filed his petition.

The same is true for both Morgan (supplemental petition filed Jan. 21, 2016) and Dugan (supplemental petition filed Feb. 3, 2016). Nevertheless, Petitioners waited until well after they filed their petition or supplemental petitions to obtain a third declaration

35

from Dr. Vitiello. In this sense, Petitioners have presented somewhat of a "moving target" for the People to address regarding the potential evidentiary impact of Gardhouse's medical records. However, we find nothing in Dr. Vitiello's third declaration that shows Petitioners were prejudiced by their counsel's failure to hire a medical expert and challenge the cause of Gardhouse's death.

In his third declaration, Dr. Vitiello offers yet another opinion about the cause of Gardhouse's death:

> "It is my belief that the evidence gleaned from the medical records of Riverside Community Hospital and the autopsy report indicate that the death of Mr. Gardhouse was due to gross negligence in his fluid and electrolyte management resulting in a cardiac arrhythmia. This arrhythmia was a direct cause of his death. The record is clear on this point and the autopsy is entirely supportive and rules out alternative explanations."

Thus, for the first time, despite having signed two previous declarations over a span of a few years, Dr. Vitiello opines that Gardhouse received grossly negligent medical care. Yet, this third declaration does not establish that the medical staff's gross negligence was the sole cause of Gardhouse's death. Instead, Dr. Vitiello declared that the medical staff was grossly negligent in managing Gardhouse's fluid and electrolyte levels leading to cardiac arrhythmia. "This arrhythmia was a direct cause of his death." He also opined that it was "probable" that Gardhouse would have survived, "had this negligence not occurred" "as his admission Glasgow Coma Scale predicted."[10] In addition, Dr. Vitiello

---

10    Dr. Vitiello appears to base this portion of his opinion on an initial Glasgow coma scale of 12. However, the hospital records indicate that Gardhouse deteriorated to a six. Dr. Vitiello does not appear to take into account this deterioration in opining that it was

does not opine that Gardhouse's head trauma was not a substantial cause in his death. (See *Catlin*, *supra,* 26 Cal.4th at p. 155.)

In summary, even considering all three of Dr. Vitiello's declarations together, Petitioners have not provided evidence that the medical staff's gross negligence was the sole cause of Gardhouse's death. (See *People v. Roberts* (1992) 2 Cal.4th 271, 312 ["If a person inflicts a dangerous wound on another, it is ordinarily no defense that inadequate medical treatment contributed to the victim's death," with the exception being "when medical treatment is grossly improper, it may discharge liability for homicide if the maltreatment is the sole cause of death and hence an unforeseeable intervening cause."].) In fact, Dr. Vitiello's declarations would not be admissible at this juncture to undermine the validity of the jury verdicts in this case. They do not establish an independent intervening cause that would absolve Petitioners from criminal liability here. (See *People v. Funes*, *supra*, 23 Cal.App.4th at p. 1523.) As such, Petitioners have not shown they were prejudiced by the failure of their counsel to retain a medical expert and challenge the cause of Gardhouse's death. Their claim for ineffective assistance of counsel fails for this reason as well.[11]

---

probable that Gardhouse would have survived. In fact, Dr. Vitiello's opinion does not address the hospital's treatment of Gardhouse's head injuries.

[11] Similarly, the same deficiencies leading us to conclude that Petitioners were not prejudiced by the failure of their counsel to retain a medical expert to challenge the cause of death also support our finding that no *Brady* violation occurred as to Westly. To be considered Brady material, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 176.) Because Gardhouse's medical records were not

B.  False Evidence

At trial, the medical examiner, Dr. Fajardo, testified that Gardhouse had an abrasion to the back of his head, a laceration on the bridge of his nose, and one to the side of his chin.  He noted that Gardhouse had sustained severe brain trauma and had undergone a craniotomy, which is a procedure where a surgeon opens the patient's head to address a brain injury.  Dr. Fajardo further testified that because Gardhouse's brain had experienced severe trauma (contusions on the brain itself), he sent the brain to a specialist.  Dr. Fajardo explained that Gardhouse's brain suffered multiple contusions, primarily to the frontal lobes with some injuries to the temporal lobes as well.  As such, Dr. Fajardo opined that Gardhouse's cause of death was blunt force cranial cerebral trauma.

Dugan and Morgan argue that Dr. Fajardo's testimony was false evidence as to Gardhouse's cause of death.  Specifically, they argue Dr. Fajardo's conclusion is undermined by Dr. Fajardo himself, Dr. Vitiello, and an objective review of the medical records.  We are not persuaded.

Section 1473, subdivision (b) provides in relevant part:  "A writ of habeas corpus may be prosecuted for, but not limited to, the following reasons:  [¶] (1) False evidence that is substantially material or probative on the issue of guilt or punishment was introduced against a person at any hearing or trial relating to his incarceration."

exculpatory or impeaching, even if the prosecution refused to provide them to Westly, we still would find no *Brady* violation here.

Further, in response to our high court's opinion in *In re Richards* (2012) 55 Cal.4th 948 (*Richards I*), the Legislature clarified what constituted false evidence regarding the testimony of expert witnesses. To this end, the Legislature added subdivision (e)(1) to section 1473, which states in full: "For purposes of this section, 'false evidence' shall include opinions of experts that have either been repudiated by the expert who originally provided the opinion at a hearing or trial or that have been undermined by later scientific research or technological advances."

The California Supreme Court recently discussed the new subdivision, observing: "The plain meaning of the amendment to section 1473 makes clear that an expert opinion given at trial can later be deemed 'false evidence' under two circumstances: (1) if the expert repudiates his or own opinion given at trial; or (2) if the opinion given at trial is undermined by subsequent 'scientific research or technological advances.' " (*In re Richards* (2016) 63 Cal.4th 291, 309 (*Richards II*); italics omitted.)

To warrant relief, Petitioners must show, "false evidence was introduced against [them] at [their] trial and that such evidence was material or probative on the issue of [their] guilt." (*In re Bell* (2007) 42 Cal.4th 630, 637.) In regard to direct evidence, "false evidence" is often proved by a declaration of a witness recanting his or her trial testimony. (*In re Sassounian* (1995) 9 Cal.4th 535, 542 [informant recanted his testimony that the petitioner confessed]; *In re Cox* (2003) 30 Cal.4th 974, 981 [witness recanted trial testimony that she saw the petitioner kill the victim].)

39

Here, Morgan and Dugan maintain that Dr. Fajardo repudiated his trial testimony. To this end, they offer the declaration of Martin Dante, a private investigator hired by Petitioners. In relevant part, Dante declares:

> "9. On June 16, 2014 I delivered relevant reports and trial testimony to Dr. Fajardo via email and sent him a list of questions I had pertaining to his examination of Mr. Gardhouse and his resultant conclusions;

> "10. On June 17, 2014 Dr. Fajardo responded to my questions by email, but was unable to speak to an important area of my inquiry related to brain injury survivability because it was outside of his medical expertise. When asked, however, whether electrolyte abnormalities can lead to cardiac arrhythmias he responded saying, 'Absolutely - especially high potassium levels.' "

Nowhere in Dante's declaration is there any indication that Dr. Fajardo repudiated his testimony. We cannot tell from the declaration what information was given to Dr. Fajardo. We do not know what questions Dante asked Dr. Fajardo. At best, Dante's declaration indicates that Dr. Fajardo acknowledged that a possible effect of electrolyte imbalance is cardiac arrhythmia. This recognition does not establish that Dr. Fajardo admitted that he was incorrect about the cause of Gardhouse's death or repudiated his trial testimony in any way. In light of this record, we view Dugan and Morgan's assertion that Dr. Fajardo repudiated his trial testimony, at best, as a gross mischaracterization of the record, and at worst, a blatant misrepresentation.

In addition, we disagree with Dugan and Morgan that Dr. Vitiello's three declarations prove that the prosecution offered false evidence during their trial. Even assuming such declarations are admissible, they merely offer a conflicting expert opinion. As our Supreme Court explained, "when new expert opinion testimony is offered that

40

criticizes or casts doubt on opinion testimony given at trial, one has not necessarily established that the opinion at trial was false. Rather, in that situation one has merely demonstrated the subjective component of expert opinion testimony." (*Richards I*, *supra*, 55 Cal.4th at p. 963; italics omitted.)

Finally, we are not persuaded by Dugan and Morgan's remaining argument that an objective review of Gardhouse's medical records supports their position that the prosecution presented false evidence. The medical records indicate that Gardhouse suffered severe blunt force trauma to his head, he received medical treatment for this trauma, and he died during the course of his treatment, specifically following a procedure meant to relieve cranial pressure.

In summary, Petitioners have not established that any false evidence was offered against them at trial. There is no evidence that Dr. Fajardo repudiated the testimony he gave at trial. And Dr. Fajardo's opinion at trial has not been undermined by subsequent scientific research or technological advances. (See *Richards II*, *supra*, 63 Cal.4th at p. 309; § 1473, subd. (e)(1).)

As such we find nothing in the medical records that shows the prosecution presented false evidence through Dr. Fajardo's testimony.

II

*THE IMPACT OF* CRAVENS

Petitioners claim we should again address the merits of their claim of insufficient evidence to support their convictions for second degree murder because their petitions for review to the California Supreme Court were "denied without prejudice to any relief to

which defendants might be entitled after this court decides *People v. Cravens*, S186661."

Petitioners argue a comparison of the facts of *Cravens, supra,* 53 Cal.4th 500 to this case supports a finding there was insufficient evidence of implied malice presented at trial below.

A petition for writ of habeas corpus will not be entertained where the same issue was raised and rejected on appeal (*In re Waltreus* (1965) 62 Cal.2d 218, 225), unless the petitioner can show, among other things,[12] a change in the law affecting a defendant after the appeal. (*Harris*, *supra*, 5 Cal.4th at p. 841.) We will entertain a claim based on a change in the law if (1) the change in law is retroactive to the final judgment; (2) the claim is properly asserted; and (3) if the application of the former rule of law is shown to be prejudicial to petitioners. (*In re Clark* (1993) 5 Cal.4th 750, 775.)

Here, Petitioners claim the California Supreme Court announced a new rule of law in *Cravens*, *supra*, 53 Cal.4th 500 that allows us to address their claims of insufficient evidence again. Petitioners misread *Cravens*. In that case, our high court reversed the conclusion of this court and held the evidence presented at trial supported the defendant's conviction for second degree murder. (*Id.* at pp. 510-512.) In doing so, the court engaged in a review of the facts and explained how those facts supported the jury's conviction of the defendant for second degree murder. (*Ibid.*) The court did not announce any new rule of law.

---

12    Our high court detailed three other exceptions to the rule espoused in *In re Waltreus*, *supra*, 62 Cal.2d 218, but Petitioners do not argue any of these exceptions apply here. (See *In re Harris* (1993) 5 Cal.4th 813, 829, 836, 838 (*Harris*).)

Petitioners' argument that we review their claim of insufficient evidence underscores the lack of any change in the law. They do not explain how the law has changed or what new pronouncement the court offered in *Cravens, supra,* 53 Cal.4th 500. Instead, they ask us to compare the facts of this case with the facts of *Cravens* to reach the conclusion that the facts here are not as extreme as those in *Cravens*, and thus, cannot support the jury's verdict of second degree murder. In essence, Petitioners are merely asking us to reconsider the sufficiency of the evidence again without any change of law whatsoever. This we cannot do. (See *In re Waltreus*, *supra*, 62 Cal.2d at p. 225.)

Because *Cravens*, *supra*, 53 Cal.4th 500 did not result in any new law, we cannot address Petitioners' claim that the evidence presented at trial was insufficient to support their convictions of second degree murder. We have already addressed this claim on the Petitioners' direct appeal and found it wanting. We will not engage in this analysis again.

III

*MORGAN'S CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL*
*WITH RESPECT TO THE JURY INSTRUCTIONS*

Morgan argues that his trial counsel was prejudicially ineffective because he failed to object to the modified CALCRIM No. 375 instruction provided to the jury. The People counter that Morgan cannot raise this issue for the first time in a petition for writ of habeas corpus. Because Morgan did not raise it on direct appeal, the People contend this issue is now barred under *In re Dixon* (1953) 41 Cal.2d 756.

Morgan asserts the claim is not procedurally barred here because "claims of ineffective assistance are often more appropriately litigated in a habeas corpus

43

proceeding, the rules generally prohibiting raising an issue on habeas corpus that was, or could have been raised on appeal [citations] would not bar an ineffective assistance claim on habeas corpus."  (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.)  As Morgan is claiming his trial counsel was ineffective, we will address his claim on the merits.

At trial, the court instructed the jury with a modified instruction as follows:

> "*The People presented evidence of other behavior by defendants, Travis Westly and Jonathan Morgan that was not charged in this case, that on or about June 2004, both Defendant's [sic] Westly and Morgan were allegedly involved in other assaultive [sic] behavior and conduct and that in January of 2005, Defendant Westly was involved in such assaultive behavior and conduct.*
>
> "[¶] . . . [¶]
>
> "Defendant Dugan was not involved in either incident.  Do not consider this evidence against defendant Dugan.  You may consider this evidence as to Defendants Westly and Morgan, but only if the People have proved beyond a reasonable doubt that defendants Westly and/or Morgan in fact committed the uncharged acts.
>
> "If the People have not met this burden, you must disregard this evidence entirely.
>
> "If you decide that defendant Westly and/or Morgan committed the uncharged acts, you may, but are not required to, consider that evidence as to that defendant for the limited purpose of deciding whether or not:
>
> "(1)  Defendant Westly and/or Morgan acted with the intent necessary to commit the crime of Second Degree Murder in this case; and/or
>
> "(2)  Defendant Westly and/or Morgan had a motive to commit the offense alleged in [this] case; and /or
>
> "(3)  Defendant Westly and/or Morgan knew the danger to human life when they each allegedly acted in this case."

44

Morgan argues that the preamble to the modified instruction, which we have italicized, suggested the prosecution had proved the prior bad acts and indirectly certain essential elements of the charged crimes, thereby reducing the prosecution's burden of proof and violating Morgan's due process rights. He contends that *People v. Owens* (1994) 27 Cal.App.4th 1155 (*Owens*) requires reversal. It does not. In that case, the challenged instruction stated that the prosecution introduced evidence " 'tending to prove' " the defendant's guilt. (*Id.* at p. 1158). The court found that the instruction was in error because it carried the inference that the prosecution had, in fact, established guilt. (*Id*. at pp. 1158-1159.) The court also found, however, that the erroneous instruction was not likely to have misled the jury since the trial court also instructed the jury that a defendant was presumed innocent, that the prosecution had the burden of proving the defendant guilty beyond a reasonable doubt and that its instructions should not be construed as an expression of the court's opinions on any facts. (*Id*. at p. 1159.) The same or similar instructions were provided here.

In addition, the challenged portion of the instruction given to the jury in the instant matter did not include the phrase "tending to prove" that the court found improper in *Owens, supra,* 27 Cal.App.4th 1155. Instead, the trial court merely instructed the jury that the prosecution presented evidence, but that the jury should disregard it unless the prosecution proved beyond a reasonable doubt that Morgan and/or Westly committed the uncharged acts. In light of these explanations and caveats, no juror could reasonably assume that the trial court believed that the prosecution had met its burden with respect to

45

either the charged or uncharged crimes. As such, we conclude the challenged instruction was not improper and did not violate Morgan's due process rights.

Having found nothing wrong with the challenged instruction, we need not reach Morgan's claim that his trial counsel was prejudicially ineffective for failing to object to it.

## DISPOSITION

The petitions are denied.

 

HUFFMAN, Acting P. J.

WE CONCUR:

NARES, J.

AARON, J.

46