Moore, J., Concurring.
I write separately because I believe there were significant problems with the eyewitness identifications, including suggestive photographic lineups and improper prosecutorial tactics, which resulted in Miles' conviction. The majority opinion does not find Miles to be "factually innocent." But there is a very strong likelihood that an innocent man has spent almost 19 years in custody for a crime he did not commit.
There are several procedural safeguards that exist to protect against the misidentification of suspects, such as the double-blind administration of photographic lineups. But many of these safeguards were not followed in this case. Therefore, in addition to his "new evidence" claim, I am of the opinion that there was sufficient proof to support Miles' alternative claim of "false" eyewitness identification evidence.
It should be noted that this investigation took place many years ago when the study of eyewitness identification evidence was in its early stages. As the field progresses, we are learning just how vital photographic lineup safeguards are to fair prosecutions. There is nothing in this record that indicates that the investigating detective acted with improper motives. In fact, at one point the detective stated that: "the last thing I've ever wanted to do as a law enforcement officer is to put an innocent man in jail." I take him at his word.
The Test for False Evidence
"A writ of habeas corpus may be prosecuted for, but not limited to , the following reasons: (1) False evidence that is substantially material or probative on the issue of guilt or punishment was introduced against a person at a hearing or trial relating to his or her incarceration." (§ 1473, subd. (b), italics added.) False evidence claims may be pursued on the grounds of false eyewitness identifications. (See, e.g., In re Bell (2007) 42 Cal.4th 630, 67 Cal.Rptr.3d 781, 170 P.3d 153 ; In re Roberts (2003) 29 Cal.4th 726, 128 Cal.Rptr.2d 762, 60 P.3d 165 ; In re Hall (1981) 30 Cal.3d 408, 179 Cal.Rptr. 223, 637 P.2d 690.)
The term "false" evidence should not be understood to somehow mean "falsified" evidence or "fabricated" evidence. (See In re Hall , supra , 30 Cal.3d at p. 424, 179 Cal.Rptr. 223, 637 P.2d 690 [issuance of writ of habeas corpus was justified on ground that identification testimony "was false, albeit unintentionally so"].) A habeas petitioner is not required to show that false evidence was the result of perjury, or that prosecution or its agents were aware of the false nature of the evidence. (§ 1473, subd. (c).) Various dictionaries define the word "false" in different ways, but in the context of a habeas corpus claim, "false" evidence most closely means that *796 the evidence was "not genuine." (Webster's 11th Collegiate Dict. (2007) p. 451, col. 1; compare People v. Bamberg (2009) 175 Cal.App.4th 618, 627, 96 Cal.Rptr.3d 139.)
In order to evaluate a false evidence claim in the context of a habeas corpus petition, courts engage in a two-step analysis. First, a habeas petitioner seeking relief must show by a preponderance of the evidence "that false evidence was offered against him at trial." (In re Richards (2012) 55 Cal.4th 948, 976, 150 Cal.Rptr.3d 84, 289 P.3d 860.) Second, courts then evaluate whether that "false evidence was material." (In re Richards (2016) 63 Cal.4th 291, 312, 202 Cal.Rptr.3d 678, 371 P.3d 195 (Richards ).) That is, courts look at the false evidence and ask whether it was of such significance " 'that with reasonable probability it could have affected the outcome.' " (§ 1473, subd. (b) ; In re Sassounian (1995) 9 Cal.4th 535, 546, 37 Cal.Rptr.2d 446, 887 P.2d 527.)
The Pretrial Photo Identifications of Miles Were Unduly Suggestive
The United States Supreme Court has held that a conviction must be reversed, because of the lack of due process, where false eyewitness identification at trial followed a pretrial photo identification procedure that was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (Simmons v. United States (1968) 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 ; People v. Thomas (2012) 54 Cal.4th 908, 931, 144 Cal.Rptr.3d 366, 281 P.3d 361.) An identification procedure violates due process where it is conducive to mistaken identification. (Stovall v. Denno (1967) 388 U.S. 293, 301-302, 87 S.Ct. 1967, 18 L.Ed.2d 1199.)
" '[I]t is a matter of common experience that, once a witness has picked out the accused at the line-up, he is not likely to go back on his word later on, so that in practice the issue of identity may (in the absence of other relevant evidence) for all practical purposes be determined there and then, before the trial.' " (United States v. Wade (1967) 388 U.S. 218, 229, fn. 8, 87 S.Ct. 1926, 18 L.Ed.2d 1149, citing Williams and Hammelmann, Identification Practices, Part I (1963) Crim. L. Rev. 479, 482.) " ' "In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive, and unnecessary, if so, (2) whether the [in-court] identification itself was nevertheless reliable under the totality of the circumstances...." ' " (People v. Thomas , supra , 54 Cal.4th at p. 930, 144 Cal.Rptr.3d 366, 281 P.3d 361.)
Eyewitness misidentification is widely acknowledged as the "greatest cause of wrongful convictions." (State v. Henderson (2011) 208 N.J. 208, 231, 27 A.3d 872 (Henderson ).) In Henderson, the New Jersey Supreme Court conducted an extensive survey of scientific studies of eyewitness identifications and memory. The court initiated and largely adopted a Special Master's report that evaluated "scientific and other evidence about eyewitness identifications. The Special Master presided over a hearing that probed testimony by seven experts and produced more than 2,000 pages of transcripts along with hundreds of scientific studies." (Id . at pp. 217-218, 27 A.3d 872.)
There are several "estimator variables" or factors peculiar to the circumstances of the crime that can affect the reliability of witness identifications. (Henderson , supra , 208 N.J. at pp. 261-273, 27 A.3d 872.) These types of factors have long been taken into consideration in California courts and include such things as the witness's degree of stress, the ability of the witness *797 to observe the suspect, and the problems involved in cross-racial identifications. (Ibid . see also CALCRIM No. 315 [factors a jury can consider when evaluating eyewitness testimony].) Indeed, the jury in Miles' trial heard competing expert testimony regarding these factors and was instructed to consider the impact of those factors when evaluating the eyewitness evidence.
But more importantly, when it comes to due process considerations, there are "system variables," which can also greatly affect the reliability of eyewitness identifications. These are factors that are entirely within the control of law enforcement, such as how lineups are constructed and how identification procedures are conducted. (Henderson, supra, 208 N.J. at pp. 248-261, 27 A.3d 872.) In this case, Miles' jury was not instructed regarding these "system variables," nor did the jury hear any expert testimony on this subject. That testimony only came from an expert who testified in the first habeas proceeding and the prosecution did not rebut that testimony.
The manner in which a photo lineup is constructed can affect the reliability of a witness' identification. (See People v. Johnson (2010) 183 Cal.App.4th 253, 272, 107 Cal.Rptr.3d 228 ; People v. Cook (2007) 40 Cal.4th 1334, 1355, 58 Cal.Rptr.3d 340, 157 P.3d 950.) "Properly constructed lineups test a witness' memory and decrease the chance that a witness is simply guessing." (Henderson , supra , 208 N.J. at p. 251, 27 A.3d 872.) In Henderson , the New Jersey court summarized several guidelines that law enforcement generally follow in order to construct a fair lineup. (Id. at pp. 251-262, 27 A.3d 872.)
First, "lineups should not feature more than one suspect. As the Special Master found, 'if multiple suspects are in the lineup, the reliability of a positive identification is difficult to assess, for the possibility of "lucky" guesses is magnified.' " (Henderson , supra , 208 N.J. at pp. 251-252, 27 A.3d 872.) This principle seems to be logical and self-evident. The eyewitness evidence expert who testified at the habeas hearing said that the whole purpose of having one suspect and five "fillers" in a six-pack photographic lineup is to protect against mistaken identification. He said that: "As you increase the number of suspects in the lineup, you're increasing the chance of error rate that somebody's going to be selected. You're actually violating the whole point of doing a six pack or a lineup." Further, the suspect photo should also be placed randomly in the six-pack lineup. "Consider placing suspects in different positions in each lineup, both across cases and with multiple witnesses in the same case. Position the suspect randomly in the lineup." (U.S. Dept. of Justice Research Report, Eyewitness Evidence, A Guide for Law Enforcement (Oct. 1999) p. 30.)
Second, "lineups should include a minimum number of fillers. The greater the number of choices, the more likely the procedure will serve as a reliable test of the witness' ability to distinguish the culprit from an innocent person." (Henderson , supra , 208 N.J. at p. 251, 27 A.3d 872.) There is "no magic number [that] exists, but there appears to be general agreement that a minimum of five fillers should be used." (Ibid. ) In California, there is no per se requirement, but it appears that a six-pack photo array containing five fillers is the norm. (See, e.g., People v. Carlos (2006) 138 Cal.App.4th 907, 911, 41 Cal.Rptr.3d 873.) Indeed, the federal guidelines from the Department of Justice state that when composing a photographic lineup the investigator should: "Include a minimum of five fillers (nonsuspects) per identification procedure." (U.S.
*798 Dept. of Justice Research Report, Eyewitness Evidence, A Guide for Law Enforcement, supra , at p. 29.)
Third, and probably most important, "a suspect should be included in a lineup comprised of look-alikes. The reason is simple: an array of similar looking people forces witnesses to examine their memory. In addition, a biased lineup may inflate a witness' confidence in the identification because the selection process seemed easy." (Henderson , supra , 208 N.J. at p. 251, 27 A.3d 872.) Indeed, it has long been recognized in California that a six-pack photo array is impermissibly suggestive where the defendant's photograph "stand[s] out" from the others. (People v. Carlos , supra , 138 Cal.App.4th at p. 912, 41 Cal.Rptr.3d 873.)
Here, the Fullerton detective constructed eight six-pack photographic lineups and showed them to the three eyewitnesses: Holguin, Patlan, and Gomez. While there is no indication that he acted with improper motives, the detective, in varying degrees, violated all of the modern basic principles noted above that exist to ensure the reliability of eyewitness identifications. These systemic violations, which occurred from the outset of the detective's investigation, were so "impermissibly suggestive" that, when judged in the totality of the surrounding circumstances (as discussed in the probability analysis in the majority opinion), there was a "very substantial likelihood" of a tainted misidentification at trial and ultimately a violation of Miles' due process rights.
First, the detective violated the first basic principle of fair lineup construction by placing multiple suspects in multiple lineups. The detective constructed eight six-pack photo arrays and labeled them A through H. Lineup A consisted of only one suspect, Teamer, who was placed in position one and had been previously identified by Holguin, the only witness who had any interaction with him. But for the remaining seven lineups, lineups B through H, the detective placed multiple suspects in four of the lineups in order to identify both Accomplice One (the skinny robber) and Accomplice Two (the chubby robber). Significantly, this error was present in lineup H, the lineup that contained Miles' photograph in addition to that of one other suspect. Further, the suspect photos did not appear to be randomized. That is, in seven of the eight six-pack lineups, a photograph of a suspect was placed in position one.
The Attorney General argues in her return that the detective included Miles as a "filler" in lineup H. But at the initial habeas hearing the detective agreed that lineup H contained two suspects and four fillers. The detective knew Miles was in the same gang as Teamer and placed his photo in lineup H along with another gang member. The detective only later characterized Miles as "kind of like a filler photo" because the other gang member included in lineup H was more of a target in his mind. But this admission by the detective reveals the nature of the error that occurred: "fillers" are, by definition, nonsuspects. Again, by placing multiple suspects in multiple lineups the detective violated perhaps the most basic and fundamental tenet of fair lineup construction.
The detective also violated another principle of fair lineup construction: lineups must contain an adequate number of "fillers." This violation was part and parcel of the first violation (placing multiple suspects in multiple lineups). That is, if more than one suspect is placed in a six-pack lineup, the number of "filler" photos is necessarily reduced. For example, in lineup E the detective included photographs of four suspects, which necessarily reduced the number of fillers to two. Compounding *799 that error, one of the suspects in lineup E was six feet, and one inch tall and 180 pounds, while another was five feet, eleven inches tall and 230 pounds. When asked about this, the detective explained that, "I was looking at two different suspects with two different descriptions." That is, while constructing the six-pack lineups, the detective combined photographs of those people matching the description for Accomplice One (the thinner robber) with those people matching the description for Accomplice Two (the chubbier robber). Thus, the detective improperly combined two separate lineup procedures into one, apparently for the sake of expediency.
This leads to the third, and most serious concern regarding the detective's construction of the lineups: the overriding principle that all the persons placed in a lineup should be similar in appearance. (People v. Dampier (1984) 159 Cal.App.3d 709, 712-713, 205 Cal.Rptr. 728.) While it is not of course possible that the photographs be identical, each of them must represent a viable choice based on the descriptions of the witnesses and there should be nothing that causes the suspect to " 'stand out' " in such a way that suggests that the witness should select him. (People v. Carpenter (1997) 15 Cal.4th 312, 367, 63 Cal.Rptr.2d 1, 935 P.2d 708, disapproved on another ground in People v. Diaz (2015) 60 Cal.4th 1176, 1190, 185 Cal.Rptr.3d 431, 345 P.3d 62.) According to the unimpeached expert testimony at the habeas proceeding, research shows that if only one person in a lineup matches the description given by the witnesses, then that person is the most likely to be selected.
Here, the description that the detective was working from for the purposes of assembling a six-pack photographic lineup for Accomplice Two was a black male, dark complexion, and stocky enough to cause a roll on the back of his neck. In lineup H, the six-pack lineup used to identify Miles, his photograph was placed in position one and is arguably the only photograph that appears to fit that description. That is, all six of the photographs were, of course, of black males. But three of the men in the photographs do not appear to have particularly dark complexions. And more importantly, five of the men do not appear to be stocky enough to cause a roll on the back of their necks. This lone photograph, depicting a black male with dark complexion and stocky enough to cause a roll on the back of his neck, logically caused Miles to "stand out" from the others in the lineup.
Indeed, at least four of the persons in lineup H (the photographs placed in positions two, three, four, and six) appear to more closely match the description of Accomplice One, the thinner robber. Therefore, the best that can be said is that lineup H contained only two possible photographs that may have fit the description of Accomplice Two: Miles and one filler. Effectively, the identification of Miles as Accomplice Two came down to at most to a 50/50 proposition. Indeed, when the witness from the auto parts store, Holguin, was asked to look at lineup H, he went back and forth between Miles in position one and the only other viable person that could possibly match the description of Accomplice Two, the person in position five.
The combined effects of the detective's lineup construction violations mentioned above rendered all three of the pretrial photo identifications "unduly suggestive." Moreover, in addition to the flawed construction of the lineups, the detective compromised another "system variable" with respect to Patlan: the pre-identification instructions.
California does not have a per se rule requiring pre-identification instructions. ( *800 People v. Lucas (2014) 60 Cal.4th 153, 237, 177 Cal.Rptr.3d 378, 333 P.3d 587, disapproved on another ground in People v. Romero and Self (2015) 62 Cal.4th 1, 53, fn. 19, 191 Cal.Rptr.3d 855, 354 P.3d 983.) But there appears to be a broad consensus that witnesses should be admonished before an identification procedure. "Identification procedures should begin with instructions to the witness that the suspect may or may not be in the lineup or array and that the witness should not feel compelled to make an identification." (Henderson , supra , 208 N.J. at p. 250, 27 A.3d 872.) The reason for this pre-identification admonition is to work against a possible assumption by the witness that the suspect is present in the lineup and the witnesses' only task is to choose the correct one. Further, investigating officers are advised to minimize anything in advance of the lineup that may contaminate the identification process: "To maintain the reliability of eyewitness identification, you must avoid any conduct prior to the identification that might be ruled suggestive. Never tell the witness: [¶] you caught (or think you caught) the person who committed the crime." (California District Attorney's Association, California Peace Officers Legal Sourcebook (Rev. Sept. 2014) pp. 8.1-8.2.)
Here, about a month after the robbery and before showing Patlan lineup H, the detective notified him in advance that he had apprehended two suspects, apparently to assuage his fears. And although Patlan signed the standard written admonishment advising him that the robbers may or may not be present in the lineup, this admonition was effectively negated because Patlan already knew in advance that both of the robbers had apparently been apprehended.
Finally, there was one other area of potential concern regarding the pretrial identification procedures in this case: the lack of double-blind or blind administration. Again, it appears to be self-evident that this type of administration enhances the reliability of eyewitness identifications. "An identification may be unreliable if the lineup procedure is not administered in double-blind or blind fashion. Double-blind administrators do not know who the actual suspect is. Blind administrators are aware of that information but shield themselves from knowing where the suspect is located in the lineup or photo array." (Henderson , supra , 208 N.J. at p. 248, 27 A.3d 872.)
If the administrator of the lineup is familiar with the suspect, then that information can be communicated to the witnesses either "consciously or subconsciously." (Henderson , supra , 208 N.J. at pp. 248-249, 27 A.3d 872.) "The consequences are clear: a non-blind lineup procedure can affect the reliability of a lineup because even the best-intentioned, non-blind administrator can act in a way that inadvertently sways an eyewitness trying to identify a suspect. An ideal lineup administrator, therefore, is someone who is not investigating the particular case and does not know who the suspect is." (Id . at p. 249, 27 A.3d 872.) However, the California Supreme Court has refused to adopt a per se rule requiring police to conduct photographic lineups in a blind or double-blind fashion. (People v. Lucas , supra , 60 Cal.4th at p. 237, 177 Cal.Rptr.3d 378, 333 P.3d 587.)
Here, the same Fullerton detective investigated the robbery, identified possible suspects, and then constructed the six-pack lineups, which included the photographs of the possible suspects he had identified. The same detective then administered those lineups to the witnesses. Thus, the danger of unintentional witness contamination was clearly present. In sum, the pretrial identification lineups and procedures *801 involving Patlan, Gomez, and Holguin were unduly suggestive.
Gomez's In-Court Identification of Miles Was Also Unduly Suggestive
Another basic principle of reliable eyewitness identifications is that there should be an effort to avoid giving feedback to witnesses. "Information received by witnesses both before and after an identification can affect their memory." (Henderson , supra , 208 N.J. at p. 253, 27 A.3d 872.) Confirmatory feedback occurs when it is signaled "to eyewitnesses that they correctly identified the suspect. That confirmation can reduce doubt and engender a false sense of confidence in a witness. Feedback can also falsely enhance a witness' recollection of the quality of his or her view of an event." (Ibid. )
There is also a danger of a "carryover effect" in eyewitness identifications. This essentially means that viewing a photograph once in a picture can affect all future identifications. "Viewing a suspect more than once during an investigation can affect the reliability of the later identification. The problem, as the Special Master found, is that successive views of the same person can make it difficult to know whether the later identification stems from a memory of the original event or a memory of the earlier identification procedure." (Henderson , supra , 208 N.J. at p. 255, 27 A.3d 872.)
Here, Gomez unequivocally identified Miles as Accomplice Two at trial in front of the jury. But the events that occurred outside of the presence of the jury just prior to Gomez's identification contaminated the reliability of that in-court identification.
During a morning break, when the judge and the jury were not present, the prosecutor asked Gomez if she could identify Miles as Accomplice Two. Gomez repeatedly told the prosecutor that she was unable to do so, even after Gomez had walked up to Miles at counsel table and studied him closely and carefully. The jury heard about this encounter after the fact because Miles's counsel was present, took notes, and thoroughly cross-examined and argued the point. But had this event transpired in front of the jury, there can only be speculation as to what effect that may have had. Indeed, it is not unheard of for witnesses to be unable to identify defendants in court. Trials often occur months or years after the events that precipitated them; criminal defendants are often dressed differently in court. Generally, prosecutors usually address these anomalies forthrightly and explain the possible reasons for in-court misidentifications during closing argument.
But what the prosecutor did in this case was troubling, to say the least. Gomez related that during the period of her uncertainty, the prosecutor showed her a color photocopy of Miles' booking photo outside of the presence of the jury. In fact, according to Miles' counsel, this occurred in the hallway outside of the courtroom while another witness from the loan office was present. The booking photo is clear: it shows that Miles had been arrested by the Fullerton Police Department on August 5, 1998. It was only after looking at the booking photo that Gomez said, "I looked at the picture she showed me, and then I was certain that that is [Accomplice Two] in the robbery."
There are many troubling aspects to this ad hoc photo identification procedure. In the first place, it had none of the reliability protections that come with a properly executed six-pack photographic lineup utilizing one suspect and five fillers as discussed earlier. The prosecutor essentially conducted a photographic lineup with only one photograph. There was also presumably *802 no formal admonition. Further, the prosecutor's showing of the booking photo to Gomez during the period of her uncertainty gave Gomez precisely the type of positive feedback that experts in the field feel should be avoided. That is, the booking photo undoubtedly signaled to Gomez that she had correctly identified Miles as Accomplice Two; she could plainly see from the booking photo that Miles was, in fact, the person that had been arrested near the time of the robbery. Moreover, the entire episode appears to have reduced or eliminated any doubt that she may have had. This undoubtedly engendered a false sense of confidence, and Gomez's confidence in her identification was undoubtedly communicated to the jury.
Additionally, there is also a concern about the possible "carryover effect" of Gomez's multiple photo identifications. That is, it is impossible to know whether Gomez's in-court identification of Miles stemmed from her actual memory of seeing him at the robbery or whether it stemmed from her memory of seeing Miles' photograph in the earlier six-pack lineup as well as the booking photo, which the prosecutor showed to Gomez just prior to her testimony.
The False Eyewitness Evidence Was Material
A recent California Supreme Court case has been helpful to analyzing the legal standard for determining the materiality of false evidence. (Richards , supra , 63 Cal.4th 291, 202 Cal.Rptr.3d 678, 371 P.3d 195.) In Richards , a jury convicted defendant of his wife's murder. At trial, the prosecution introduced the testimony of a dental expert who testified that a bite mark on the wife's hand was consistent with the defendant's "unusual teeth." (Id. at pp. 293, 300-302, 202 Cal.Rptr.3d 678, 371 P.3d 195.) In forming his opinion, the expert relied on an autopsy photograph of a "crescent-shaped lesion" on the victim's hand. (Id . at pp. 300-302, 202 Cal.Rptr.3d 678, 371 P.3d 195.) Ten years after defendant's conviction, the dental expert repudiated his own opinion in a habeas corpus proceeding. The California Supreme Court ultimately found that the defendant had established that the dental expert's trial testimony constituted " 'false evidence' " under a recently amended portion of section 1473, subdivision (c),[1] which changed the definition of false evidence as it relates to expert testimony. (Id. at p. 311, 202 Cal.Rptr.3d 678, 371 P.3d 195.)
In Richards , once the Supreme Court had determined that "false evidence" had been presented to the jury, it then focused on the materiality determination, and ultimately found the false expert testimony material and granted habeas relief. (Richards , supra , 63 Cal.4th at pp. 312-315, 202 Cal.Rptr.3d 678, 371 P.3d 195.) "The statute and the prior decisions applying section 1473 make clear that once a defendant shows that false evidence was admitted at trial, relief is available under [section] 1473 as long as the false evidence was 'material.' Our case law further explains that false *803 evidence is material ' "if there is a 'reasonable probability' that, had it not been introduced, the result would have been different." ' [Citation.] The remedial purpose of the statute is to afford the petitioner relief if the 'false evidence [was] of such significance that it may have affected the outcome of the trial....' [Citation.] Thus, the crucial question is whether the false evidence was material-not whether, without the false evidence, there was still substantial evidence to support the verdict." (Richards , at p. 312, 202 Cal.Rptr.3d 678, 371 P.3d 195, italics added.) The "materiality" determination is the same prejudice standard appellate courts routinely employ: "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (People v. Watson (1956) 46 Cal.2d 818, 836, 299 P.2d 243.)
It is not necessary at this point to fully review the entirety of the evidence. In short, the prosecution relied on the eyewitness testimony of Patlan and Gomez who identified Miles as Accomplice Two at the scene of the Fidelity office in Fullerton on June 29, 1998. Without that testimony, which can now fairly be characterized as "false" within the meaning of the habeas corpus statute, there is a reasonable probability that the jury would not have convicted Miles. Thus, in my opinion, the false identification evidence was "material" and therefore would have been dispositive for the purposes of granting Miles habeas corpus relief.

"For purposes of this section, 'false evidence' includes opinions of experts that have either been repudiated by the expert who originally provided the opinion at a hearing or trial or that have been undermined by later scientific research or technological advances." (§ 1473, subd. (e)(1).) Miles argued in a letter brief that the opinion of the Peoples' eyewitness expert witness, Dr. Ebbe Ebbsen, who was called in rebuttal at Miles' 1998 trial has been "undermined by later scientific research" since that time. Dr. Ebbsen had largely criticized the methodology of the research relied upon by the defense's eyewitness expert who had been called at trial, Dr. Scott Fraser. This particular "false evidence" claim has not been factored into the analysis because no evidentiary hearings have been conducted regarding that issue.